# NEW JERSEY *v.* T. L. O.

No. 83–712.   Argued March 28, 1984—Reargued October 2, 1984—
Decided January 15, 1985

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and POWELL, REHNQUIST, and O'CONNOR, JJ., joined, and in Part II of which BRENNAN, MARSHALL, and STEVENS, JJ., joined.   POWELL, J., filed a concurring opinion, in which O'CONNOR, J., joined, post, p. 348.

BLACKMUN, J., filed an opinion concurring in the judgment, *post*, p. 351. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which MARSHALL, J., joined, *post*, p. 353. STEVENS, J., filed an opinion concurring in part and dissenting in part, in which MARSHALL, J., joined, and in Part I of which BRENNAN, J., joined, *post*, p. 370.

*Allan J. Nodes*, Deputy Attorney General of New Jersey, reargued the cause for petitioner. With him on the brief on reargument were *Irwin J. Kimmelman*, Attorney General, and *Victoria Curtis Bramson*, *Linda L. Yoder*, and *Gilbert G. Miller*, Deputy Attorneys General. With him on the briefs on the original argument were Mr. Kimmelman and Ms. Bramson.

*Lois De Julio* reargued the cause for respondent. With her on the briefs were *Joseph H. Rodriguez* and *Andrew Dillmann*.*

JUSTICE WHITE delivered the opinion of the Court.

We granted certiorari in this case to examine the appropriateness of the exclusionary rule as a remedy for searches carried out in violation of the Fourth Amendment by public school authorities. Our consideration of the proper application of the Fourth Amendment to the public schools, however, has led us to conclude that the search that gave rise to

---

*Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Lee*, *Deputy Solicitor General Frey*, and *Kathryn A. Oberly*; for the National Association of Secondary School Principals et al. by *Ivan B. Gluckman*; for the National School Boards Association by *Gwendolyn H. Gregory*, *August W. Steinhilber*, and *Thomas A. Shannon*; for the Washington Legal Foundation by *Daniel J. Popeo* and *Paul D. Kamenar*; and for the New Jersey School Boards Association by *Paula A. Mullaly* and *Thomas F. Scully*.

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Mary L. Heen*, *Burt Neuborne*, *E. Richard Larson*, *Barry S. Goodman*, and *Charles S. Sims*; and for the Legal Aid Society of the City of New York et al. by *Janet Fink* and *Henry Weintraub*.

*Julia Penny Clark* and *Robert Chanin* filed a brief for the National Education Association as *amicus curiae*.

the case now before us did not violate the Fourth Amendment. Accordingly, we here address only the questions of the proper standard for assessing the legality of searches conducted by public school officials and the application of that standard to the facts of this case.

I

On March 7, 1980, a teacher at Piscataway High School in Middlesex County, N. J., discovered two girls smoking in a lavatory. One of the two girls was the respondent T. L. O., who at that time was a 14-year-old high school freshman. Because smoking in the lavatory was a violation of a school rule, the teacher took the two girls to the Principal's office, where they met with Assistant Vice Principal Theodore Choplick. In response to questioning by Mr. Choplick, T. L. O.'s companion admitted that she had violated the rule. T. L. O., however, denied that she had been smoking in the lavatory and claimed that she did not smoke at all.

Mr. Choplick asked T. L. O. to come into his private office and demanded to see her purse. Opening the purse, he found a pack of cigarettes, which he removed from the purse and held before T. L. O. as he accused her of having lied to him. As he reached into the purse for the cigarettes, Mr. Choplick also noticed a package of cigarette rolling papers. In his experience, possession of rolling papers by high school students was closely associated with the use of marihuana. Suspecting that a closer examination of the purse might yield further evidence of drug use, Mr. Choplick proceeded to search the purse thoroughly. The search revealed a small amount of marihuana, a pipe, a number of empty plastic bags, a substantial quantity of money in one-dollar bills, an index card that appeared to be a list of students who owed T. L. O. money, and two letters that implicated T. L. O. in marihuana dealing.

Mr. Choplick notified T. L. O.'s mother and the police, and turned the evidence of drug dealing over to the police. At

the request of the police, T. L. O.'s mother took her daughter to police headquarters, where T. L. O. confessed that she had been selling marihuana at the high school. On the basis of the confession and the evidence seized by Mr. Choplick, the State brought delinquency charges against T. L. O. in the Juvenile and Domestic Relations Court of Middlesex County.[1] Contending that Mr. Choplick's search of her purse violated the Fourth Amendment, T. L. O. moved to suppress the evidence found in her purse as well as her confession, which, she argued, was tainted by the allegedly unlawful search. The Juvenile Court denied the motion to suppress. *State ex rel. T. L. O.*, 178 N. J. Super. 329, 428 A. 2d 1327 (1980). Although the court concluded that the Fourth Amendment did apply to searches carried out by school officials, it held that

> "a school official may properly conduct a search of a student's person if the official has a reasonable suspicion that a crime has been or is in the process of being committed, *or* reasonable cause to believe that the search is necessary to maintain school discipline or enforce school policies." *Id.*, at 341, 428 A. 2d, at 1333 (emphasis in original).

Applying this standard, the court concluded that the search conducted by Mr. Choplick was a reasonable one. The initial decision to open the purse was justified by Mr. Choplick's well-founded suspicion that T. L. O. had violated the rule forbidding smoking in the lavatory. Once the purse

---

[1] T. L. O. also received a 3-day suspension from school for smoking cigarettes in a nonsmoking area and a 7-day suspension for possession of marihuana. On T. L. O.'s motion, the Superior Court of New Jersey, Chancery Division, set aside the 7-day suspension on the ground that it was based on evidence seized in violation of the Fourth Amendment. *(T. L. O.)* v. *Piscataway Bd. of Ed.*, No. C.2865–79 (Super. Ct. N. J., Ch. Div., Mar. 31, 1980). The Board of Education apparently did not appeal the decision of the Chancery Division.

was open, evidence of marihuana violations was in plain view, and Mr. Choplick was entitled to conduct a thorough search to determine the nature and extent of T. L. O.'s drug-related activities. *Id.*, at 343, 428 A. 2d, at 1334. Having denied the motion to suppress, the court on March 23, 1981, found T. L. O. to be a delinquent and on January 8, 1982, sentenced her to a year's probation.

On appeal from the final judgment of the Juvenile Court, a divided Appellate Division affirmed the trial court's finding that there had been no Fourth Amendment violation, but vacated the adjudication of delinquency and remanded for a determination whether T. L. O. had knowingly and voluntarily waived her Fifth Amendment rights before confessing. *State ex rel. T. L. O.*, 185 N. J. Super. 279, 448 A. 2d 493 (1982). T. L. O. appealed the Fourth Amendment ruling, and the Supreme Court of New Jersey reversed the judgment of the Appellate Division and ordered the suppression of the evidence found in T. L. O.'s purse. *State ex rel. T. L. O.*, 94 N. J. 331, 463 A. 2d 934 (1983).

The New Jersey Supreme Court agreed with the lower courts that the Fourth Amendment applies to searches conducted by school officials. The court also rejected the State of New Jersey's argument that the exclusionary rule should not be employed to prevent the use in juvenile proceedings of evidence unlawfully seized by school officials. Declining to consider whether applying the rule to the fruits of searches by school officials would have any deterrent value, the court held simply that the precedents of this Court establish that "if an official search violates constitutional rights, the evidence is not admissible in criminal proceedings." *Id.*, at 341, 463 A. 2d, at 939 (footnote omitted).

With respect to the question of the legality of the search before it, the court agreed with the Juvenile Court that a warrantless search by a school official does not violate the Fourth Amendment so long as the official "has reasonable grounds to believe that a student possesses evidence of illegal

activity or activity that would interfere with school discipline and order." *Id.*, at 346, 463 A. 2d, at 941–942. However, the court, with two justices dissenting, sharply disagreed with the Juvenile Court's conclusion that the search of the purse was reasonable. According to the majority, the contents of T. L. O.'s purse had no bearing on the accusation against T. L. O., for possession of cigarettes (as opposed to smoking them in the lavatory) did not violate school rules, and a mere desire for evidence that would impeach T. L. O.'s claim that she did not smoke cigarettes could not justify the search. Moreover, even if a reasonable suspicion that T. L. O. had cigarettes in her purse would justify a search, Mr. Choplick had no such suspicion, as no one had furnished him with any specific information that there were cigarettes in the purse. Finally, leaving aside the question whether Mr. Choplick was justified in opening the purse, the court held that the evidence of drug use that he saw inside did not justify the extensive "rummaging" through T. L. O.'s papers and effects that followed. *Id.*, at 347, 463 A. 2d, at 942–943.

We granted the State of New Jersey's petition for certiorari. 464 U. S. 991 (1983). Although the State had argued in the Supreme Court of New Jersey that the search of T. L. O.'s purse did not violate the Fourth Amendment, the petition for certiorari raised only the question whether the exclusionary rule should operate to bar consideration in juvenile delinquency proceedings of evidence unlawfully seized by a school official without the involvement of law enforcement officers. When this case was first argued last Term, the State conceded for the purpose of argument that the standard devised by the New Jersey Supreme Court for determining the legality of school searches was appropriate and that the court had correctly applied that standard; the State contended only that the remedial purposes of the exclusionary rule were not well served by applying it to searches conducted by public authorities not primarily engaged in law enforcement.

Although we originally granted certiorari to decide the issue of the appropriate remedy in juvenile court proceedings for unlawful school searches, our doubts regarding the wisdom of deciding that question in isolation from the broader question of what limits, if any, the Fourth Amendment places on the activities of school authorities prompted us to order reargument on that question.[2]  Having heard argument on

[2] State and federal courts considering these questions have struggled to accommodate the interests protected by the Fourth Amendment and the interest of the States in providing a safe environment conducive to education in the public schools.  Some courts have resolved the tension between these interests by giving full force to one or the other side of the balance. Thus, in a number of cases courts have held that school officials conducting in-school searches of students are private parties acting *in loco parentis* and are therefore not subject to the constraints of the Fourth Amendment. See, *e. g., D. R. C.* v. *State*, 646 P. 2d 252 (Alaska App. 1982); *In re G.*, 11 Cal. App. 3d 1193, 90 Cal. Rptr. 361 (1970); *In re Donaldson*, 269 Cal. App. 2d 509, 75 Cal. Rptr. 220 (1969); *R. C. M.* v. *State*, 660 S. W. 2d 552 (Tex. App. 1983); *Mercer* v. *State*, 450 S. W. 2d 715 (Tex. Civ. App. 1970).  At least one court has held, on the other hand, that the Fourth Amendment applies in full to in-school searches by school officials and that a search conducted without probable cause is unreasonable, see *State* v. *Mora*, 307 So. 2d 317 (La.), vacated, 423 U. S. 809 (1975), on remand, 330 So. 2d 900 (La. 1976); others have held or suggested that the probable-cause standard is applicable at least where the police are involved in a search, see *M.* v. *Board of Ed. Ball-Chatham Community Unit School Dist. No. 5*, 429 F. Supp. 288, 292 (SD Ill. 1977); *Picha* v. *Wielgos*, 410 F. Supp. 1214, 1219–1221 (ND Ill. 1976); *State* v. *Young*, 234 Ga. 488, 498, 216 S. E. 2d 586, 594 (1975); or where the search is highly intrusive, see *M. M.* v. *Anker*, 607 F. 2d 588, 589 (CA2 1979).

The majority of courts that have addressed the issue of the Fourth Amendment in the schools have, like the Supreme Court of New Jersey in this case, reached a middle position: the Fourth Amendment applies to searches conducted by school authorities, but the special needs of the school environment require assessment of the legality of such searches against a standard less exacting than that of probable cause.  These courts have, by and large, upheld warrantless searches by school authorities provided that they are supported by a reasonable suspicion that the search will uncover evidence of an infraction of school disciplinary rules or a violation of the law.  See, *e. g., Tarter* v. *Raybuck*, No. 83–3174 (CA6, Aug. 31, 1984); *Bilbrey* v. *Brown*, 738 F. 2d 1462 (CA9 1984); *Horton* v. *Goose Creek*

the legality of the search of T. L. O.'s purse, we are satisfied that the search did not violate the Fourth Amendment.[3]

## II

In determining whether the search at issue in this case violated the Fourth Amendment, we are faced initially with the question whether that Amendment's prohibition on unreasonable searches and seizures applies to searches conducted by public school officials. We hold that it does.

---

*Independent School Dist.*, 690 F. 2d 470 (CA5 1982); *Bellnier* v. *Lund*, 438 F. Supp. 47 (NDNY 1977); *M.* v. *Board of Ed. Ball-Chatham Community Unit School Dist. No. 5*, *supra; In re W.*, 29 Cal. App. 3d 777, 105 Cal. Rptr. 775 (1973); *State* v. *Baccino*, 282 A. 2d 869 (Del. Super. 1971); *State* v. *D. T. W.*, 425 So. 2d 1383 (Fla. App. 1983); *State* v. *Young*, *supra; In re J. A.*, 85 Ill. App. 3d 567, 406 N. E. 2d 958 (1980); *People* v. *Ward*, 62 Mich. App. 46, 233 N. W. 2d 180 (1975); *Doe* v. *State*, 88 N. M. 347, 540 P. 2d 827 (App. 1975); *People* v. *D.*, 34 N. Y. 2d 483, 315 N. E. 2d 466 (1974); *State* v. *McKinnon*, 88 Wash. 2d 75, 558 P. 2d 781 (1977); *In re L. L.*, 90 Wis. 2d 585, 280 N. W. 2d 343 (App. 1979).

Although few have considered the matter, courts have also split over whether the exclusionary rule is an appropriate remedy for Fourth Amendment violations committed by school authorities. The Georgia courts have held that although the Fourth Amendment applies to the schools, the exclusionary rule does not. See, *e. g.*, *State* v. *Young*, *supra; State* v. *Lamb*, 137 Ga. App. 437, 224 S. E. 2d 51 (1976). Other jurisdictions have applied the rule to exclude the fruits of unlawful school searches from criminal trials and delinquency proceedings. See *State* v. *Mora*, *supra; People* v. *D.*, *supra.*

[3] In holding that the search of T. L. O.'s purse did not violate the Fourth Amendment, we do not implicitly determine that the exclusionary rule applies to the fruits of unlawful searches conducted by school authorities. The question whether evidence should be excluded from a criminal proceeding involves two discrete inquiries: whether the evidence was seized in violation of the Fourth Amendment, and whether the exclusionary rule is the appropriate remedy for the violation. Neither question is logically antecedent to the other, for a negative answer to either question is sufficient to dispose of the case. Thus, our determination that the search at issue in this case did not violate the Fourth Amendment implies no particular resolution of the question of the applicability of the exclusionary rule.

It is now beyond dispute that "the Federal Constitution, by virtue of the Fourteenth Amendment, prohibits unreasonable searches and seizures by state officers." *Elkins* v. *United States*, 364 U. S. 206, 213 (1960); accord, *Mapp* v. *Ohio*, 367 U. S. 643 (1961); *Wolf* v. *Colorado*, 338 U. S. 25 (1949). Equally indisputable is the proposition that the Fourteenth Amendment protects the rights of students against encroachment by public school officials:

> "The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures—Boards of Education not excepted. These have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *West Virginia State Bd. of Ed.* v. *Barnette*, 319 U. S. 624, 637 (1943).

These two propositions—that the Fourth Amendment applies to the States through the Fourteenth Amendment, and that the actions of public school officials are subject to the limits placed on state action by the Fourteenth Amendment—might appear sufficient to answer the suggestion that the Fourth Amendment does not proscribe unreasonable searches by school officials. On reargument, however, the State of New Jersey has argued that the history of the Fourth Amendment indicates that the Amendment was intended to regulate only searches and seizures carried out by law enforcement officers; accordingly, although public school officials are concededly state agents for purposes of the Fourteenth Amendment, the Fourth Amendment creates no rights enforceable against them.[4]

---

[4] Cf. *Ingraham* v. *Wright*, 430 U. S. 651 (1977) (holding that the Eighth Amendment's prohibition of cruel and unusual punishment applies only to

It may well be true that the evil toward which the Fourth Amendment was primarily directed was the resurrection of the pre-Revolutionary practice of using general warrants or "writs of assistance" to authorize searches for contraband by officers of the Crown. See *United States* v. *Chadwick*, 433 U. S. 1, 7–8 (1977); *Boyd* v. *United States*, 116 U. S. 616, 624–629 (1886). But this Court has never limited the Amendment's prohibition on unreasonable searches and seizures to operations conducted by the police. Rather, the Court has long spoken of the Fourth Amendment's strictures as restraints imposed upon "governmental action"—that is, "upon the activities of sovereign authority." *Burdeau* v. *McDowell*, 256 U. S. 465, 475 (1921). Accordingly, we have held the Fourth Amendment applicable to the activities of civil as well as criminal authorities: building inspectors, see *Camara* v. *Municipal Court*, 387 U. S. 523, 528 (1967), Occupational Safety and Health Act inspectors, see *Marshall* v. *Barlow's, Inc.*, 436 U. S. 307, 312–313 (1978), and even firemen entering privately owned premises to battle a fire, see *Michigan* v. *Tyler*, 436 U. S. 499, 506 (1978), are all subject to the restraints imposed by the Fourth Amendment. As we observed in *Camara* v. *Municipal Court, supra,* "[t]he basic purpose of this Amendment, as recognized in countless decisions of this Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." 387 U. S., at 528. Because the individual's interest in privacy and personal security "suffers whether the government's motivation is to investigate violations of criminal laws or breaches of other statutory or regulatory standards," *Marshall* v. *Barlow's, Inc., supra,* at 312–313, it would be "anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior." *Camara* v. *Municipal Court, supra,* at 530.

---

punishments imposed after criminal convictions and hence does not apply to the punishment of schoolchildren by public school officials).

Notwithstanding the general applicability of the Fourth Amendment to the activities of civil authorities, a few courts have concluded that school officials are exempt from the dictates of the Fourth Amendment by virtue of the special nature of their authority over schoolchildren. See, *e. g.*, *R. C. M.* v. *State*, 660 S. W. 2d 552 (Tex. App. 1983). Teachers and school administrators, it is said, act *in loco parentis* in their dealings with students: their authority is that of the parent, not the State, and is therefore not subject to the limits of the Fourth Amendment. *Ibid.*

Such reasoning is in tension with contemporary reality and the teachings of this Court. We have held school officials subject to the commands of the First Amendment, see *Tinker* v. *Des Moines Independent Community School District*, 393 U. S. 503 (1969), and the Due Process Clause of the Fourteenth Amendment, see *Goss* v. *Lopez*, 419 U. S. 565 (1975). If school authorities are state actors for purposes of the constitutional guarantees of freedom of expression and due process, it is difficult to understand why they should be deemed to be exercising parental rather than public authority when conducting searches of their students. More generally, the Court has recognized that "the concept of parental delegation" as a source of school authority is not entirely "consonant with compulsory education laws." *Ingraham* v. *Wright*, 430 U. S. 651, 662 (1977). Today's public school officials do not merely exercise authority voluntarily conferred on them by individual parents; rather, they act in furtherance of publicly mandated educational and disciplinary policies. See, *e. g.*, the opinion in *State ex rel. T. L. O.*, 94 N. J., at 343, 463 A. 2d, at 934, 940, describing the New Jersey statutes regulating school disciplinary policies and establishing the authority of school officials over their students. In carrying out searches and other disciplinary functions pursuant to such policies, school officials act as representatives of the State, not merely as surrogates for the parents, and they

cannot claim the parents' immunity from the strictures of the Fourth Amendment.

## III

To hold that the Fourth Amendment applies to searches conducted by school authorities is only to begin the inquiry into the standards governing such searches. Although the underlying command of the Fourth Amendment is always that searches and seizures be reasonable, what is reasonable depends on the context within which a search takes place. The determination of the standard of reasonableness governing any specific class of searches requires "balancing the need to search against the invasion which the search entails." *Camara* v. *Municipal Court, supra,* at 536–537. On one side of the balance are arrayed the individual's legitimate expectations of privacy and personal security; on the other, the government's need for effective methods to deal with breaches of public order.

We have recognized that even a limited search of the person is a substantial invasion of privacy. *Terry* v. *Ohio*, 392 U. S. 1, 24–25 (1967). We have also recognized that searches of closed items of personal luggage are intrusions on protected privacy interests, for "the Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view." *United States* v. *Ross*, 456 U. S. 798, 822–823 (1982). A search of a child's person or of a closed purse or other bag carried on her person,[5] no less

---

[5] We do not address the question, not presented by this case, whether a schoolchild has a legitimate expectation of privacy in lockers, desks, or other school property provided for the storage of school supplies. Nor do we express any opinion on the standards (if any) governing searches of such areas by school officials or by other public authorities acting at the request of school officials. Compare *Zamora* v. *Pomeroy*, 639 F. 2d 662, 670 (CA10 1981) ("Inasmuch as the school had assumed joint control of the locker it cannot be successfully maintained that the school did not have a right to inspect it"), and *People* v. *Overton*, 24 N. Y. 2d 522, 249 N. E. 2d 366 (1969) (school administrators have power to consent to search of a

than a similar search carried out on an adult, is undoubtedly a severe violation of subjective expectations of privacy.

. Of course, the Fourth Amendment does not protect subjective expectations of privacy that are unreasonable or otherwise "illegitimate." See, *e. g.*, *Hudson* v. *Palmer*, 468 U. S. 517 (1984); *Rawlings* v. *Kentucky*, 448 U. S. 98 (1980). To receive the protection of the Fourth Amendment, an expectation of privacy must be one that society is "prepared to recognize as legitimate." *Hudson* v. *Palmer*, *supra*, at 526. The State of New Jersey has argued that because of the pervasive supervision to which children in the schools are necessarily subject, a child has virtually no legitimate expectation of privacy in articles of personal property "unnecessarily" carried into a school. This argument has two factual premises: (1) the fundamental incompatibility of expectations of privacy with the maintenance of a sound educational environment; and (2) the minimal interest of the child in bringing any items of personal property into the school. Both premises are severely flawed.

Although this Court may take notice of the difficulty of maintaining discipline in the public schools today, the situation is not so dire that students in the schools may claim no legitimate expectations of privacy. We have recently recognized that the need to maintain order in a prison is such that prisoners retain no legitimate expectations of privacy in their cells, but it goes almost without saying that "[t]he prisoner and the schoolchild stand in wholly different circumstances, separated by the harsh facts of criminal conviction and incarceration." *Ingraham* v. *Wright, supra,* at 669. We are not

---

student's locker), with *State* v. *Engerud,* 94 N. J. 331, 348, 463 A. 2d 934, 943 (1983) ("We are satisfied that in the context of this case the student had an expectation of privacy in the contents of his locker. . . . For the four years of high school, the school locker is a home away from home. In it the student stores the kind of personal 'effects' protected by the Fourth Amendment").

yet ready to hold that the schools and the prisons need be equated for purposes of the Fourth Amendment.

Nor does the State's suggestion that children have no legitimate need to bring personal property into the schools seem well anchored in reality. Students at a minimum must bring to school not only the supplies needed for their studies, but also keys, money, and the necessaries of personal hygiene and grooming. In addition, students may carry on their persons or in purses or wallets such nondisruptive yet highly personal items as photographs, letters, and diaries. Finally, students may have perfectly legitimate reasons to carry with them articles of property needed in connection with extracurricular or recreational activities. In short, schoolchildren may find it necessary to carry with them a variety of legitimate, noncontraband items, and there is no reason to conclude that they have necessarily waived all rights to privacy in such items merely by bringing them onto school grounds.

Against the child's interest in privacy must be set the substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds. Maintaining order in the classroom has never been easy, but in recent years, school disorder has often taken particularly ugly forms: drug use and violent crime in the schools have become major social problems. See generally 1 NIE, U. S. Dept. of Health, Education and Welfare, Violent Schools—Safe Schools: The Safe School Study Report to the Congress (1978). Even in schools that have been spared the most severe disciplinary problems, the preservation of order and a proper educational environment requires close supervision of schoolchildren, as well as the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult. "Events calling for discipline are frequent occurrences and sometimes require immediate, effective action." *Goss* v. *Lopez*, 419 U. S., at 580. Accordingly, we have rec-

ognized that maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures, and we have respected the value of preserving the informality of the student-teacher relationship. See *id.*, at 582–583; *Ingraham* v. *Wright,* 430 U. S., at 680–682.

How, then, should we strike the balance between the schoolchild's legitimate expectations of privacy and the school's equally legitimate need to maintain an environment in which learning can take place? It is evident that the school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject. The warrant requirement, in particular, is unsuited to the school environment: requiring a teacher to obtain a warrant before searching a child suspected of an infraction of school rules (or of the criminal law) would unduly interfere with the maintenance of the swift and informal disciplinary procedures needed in the schools. Just as we have in other cases dispensed with the warrant requirement when "the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search," *Camara* v. *Municipal Court,* 387 U. S., at 532–533, we hold today that school officials need not obtain a warrant before searching a student who is under their authority.

The school setting also requires some modification of the level of suspicion of illicit activity needed to justify a search. Ordinarily, a search—even one that may permissibly be carried out without a warrant—must be based upon "probable cause" to believe that a violation of the law has occurred. See, *e. g., Almeida-Sanchez* v. *United States,* 413 U. S. 266, 273 (1973); *Sibron* v. *New York,* 392 U. S. 40, 62–66 (1968). However, "probable cause" is not an irreducible requirement of a valid search. The fundamental command of the Fourth Amendment is that searches and seizures be reasonable, and although "both the concept of probable cause and the requirement of a warrant bear on the reasonableness of a search, . . . in certain limited circumstances neither is required." *Almeida-Sanchez* v. *United States, supra,* at 277 (POWELL,

J., concurring).   Thus, we have in a number of cases recognized the legality of searches and seizures based on suspicions that, although "reasonable," do not rise to the level of probable cause.   See, *e. g., Terry* v. *Ohio,* 392 U. S. 1 (1968); *United States* v. *Brignoni-Ponce,* 422 U. S. 873, 881 (1975); *Delaware* v. *Prouse,* 440 U. S. 648, 654–655 (1979); *United States* v. *Martinez-Fuerte,* 428 U. S. 543 (1976); cf. *Camara* v. *Municipal Court, supra,* at 534–539.   Where a careful balancing of governmental and private interests suggests that the public interest is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause, we have not hesitated to adopt such a standard.

We join the majority of courts that have examined this issue[6] in concluding that the accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law. Rather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search.   Determining the reasonableness of any search involves a twofold inquiry: first, one must consider "whether the . . . action was justified at its inception," *Terry* v. *Ohio,* 392 U. S., at 20; second, one must determine whether the search as actually conducted "was reasonably related in scope to the circumstances which justified the interference in the first place," *ibid.*   Under ordinary circumstances, a search of a student by a teacher or other school official[7] will be

---

[6] See cases cited in n. 2, *supra.*

[7] We here consider only searches carried out by school authorities acting alone and on their own authority.   This case does not present the question of the appropriate standard for assessing the legality of searches conducted by school officials in conjunction with or at the behest of law enforcement agencies, and we express no opinion on that question.   Cf. *Picha* v. *Wielgos,* 410 F. Supp. 1214, 1219–1221 (ND Ill. 1976) (holding probable-cause standard applicable to searches involving the police).

"justified at its inception" when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school.[8]  Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.[9]

This standard will, we trust, neither unduly burden the efforts of school authorities to maintain order in their schools

---

[8] We do not decide whether individualized suspicion is an essential element of the reasonableness standard we adopt for searches by school authorities.  In other contexts, however, we have held that although "some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure[,] . . . the Fourth Amendment imposes no irreducible requirement of such suspicion."  *United States* v. *Martinez-Fuerte*, 428 U. S. 543, 560–561 (1976).  See also *Camara* v. *Municipal Court*, 387 U. S. 523 (1967).  Exceptions to the requirement of individualized suspicion are generally appropriate only where the privacy interests implicated by a search are minimal and where "other safeguards" are available "to assure that the individual's reasonable expectation of privacy is not 'subject to the discretion of the official in the field.'"  *Delaware* v. *Prouse*, 440 U. S. 648, 654–655 (1979) (citation omitted).  Because the search of T. L. O.'s purse was based upon an individualized suspicion that she had violated school rules, see *infra*, at 343–347, we need not consider the circumstances that might justify school authorities in conducting searches unsupported by individualized suspicion.

[9] Our reference to the nature of the infraction is not intended as an endorsement of JUSTICE STEVENS' suggestion that some rules regarding student conduct are by nature too "trivial" to justify a search based upon reasonable suspicion.  See *post*, at 377–382.  We are unwilling to adopt a standard under which the legality of a search is dependent upon a judge's evaluation of the relative importance of various school rules.  The maintenance of discipline in the schools requires not only that students be restrained from assaulting one another, abusing drugs and alcohol, and committing other crimes, but also that students conform themselves to the standards of conduct prescribed by school authorities.  We have "repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools."  *Tinker* v. *Des Moines Independent Community School District*, 393 U. S. 503, 507

nor authorize unrestrained intrusions upon the privacy of schoolchildren. By focusing attention on the question of reasonableness, the standard will spare teachers and school administrators the necessity of schooling themselves in the niceties of probable cause and permit them to regulate their conduct according to the dictates of reason and common sense. At the same time, the reasonableness standard should ensure that the interests of students will be invaded no more than is necessary to achieve the legitimate end of preserving order in the schools.

## IV

There remains the question of the legality of the search in this case. We recognize that the "reasonable grounds" standard applied by the New Jersey Supreme Court in its consideration of this question is not substantially different from the standard that we have adopted today. Nonetheless, we believe that the New Jersey court's application of that standard to strike down the search of T. L. O.'s purse reflects a somewhat crabbed notion of reasonableness. Our review of the facts surrounding the search leads us to conclude that the search was in no sense unreasonable for Fourth Amendment purposes.[10]

The incident that gave rise to this case actually involved two separate searches, with the first—the search for cigarettes—providing the suspicion that gave rise to the sec-

---

(1969). The promulgation of a rule forbidding specified conduct presumably reflects a judgment on the part of school officials that such conduct is destructive of school order or of a proper educational environment. Absent any suggestion that the rule violates some substantive constitutional guarantee, the courts should, as a general matter, defer to that judgment and refrain from attempting to distinguish between rules that are important to the preservation of order in the schools and rules that are not.

[10] Of course, New Jersey may insist on a more demanding standard under its own Constitution or statutes. In that case, its courts would not purport to be applying the Fourth Amendment when they invalidate a search.

ond—the search for marihuana.   Although it is the fruits of
the second search that are at issue here, the validity of the
search for marihuana must depend on the reasonableness of
the initial search for cigarettes, as there would have been no
reason to suspect that T. L. O. possessed marihuana had the
first search not taken place.   Accordingly, it is to the search
for cigarettes that we first turn our attention.

The New Jersey Supreme Court pointed to two grounds
for its holding that the search for cigarettes was unreason-
able.   First, the court observed that possession of cigarettes
was not in itself illegal or a violation of school rules.   Because
the contents of T. L. O.'s purse would therefore have "no
direct bearing on the infraction" of which she was accused
(smoking in a lavatory where smoking was prohibited), there
was no reason to search her purse.[11]   Second, even assuming
that a search of T. L. O.'s purse might under some circum-
stances be reasonable in light of the accusation made against
T. L. O., the New Jersey court concluded that Mr. Choplick
in this particular case had no reasonable grounds to suspect
that T. L. O. had cigarettes in her purse.   At best, accord-

---

[11]JUSTICE STEVENS interprets these statements as a holding that
enforcement of the school's smoking regulations was not sufficiently
related to the goal of maintaining discipline or order in the school to justify
a search under the standard adopted by the New Jersey court.   See *post,*
at 382–384.   We do not agree that this is an accurate characterization of
the New Jersey Supreme Court's opinion.   The New Jersey court did not
hold that the school's smoking rules were unrelated to the goal of maintain-
ing discipline or order, nor did it suggest that a search that would produce
evidence bearing directly on an accusation that a student had violated
the smoking rules would be impermissible under the court's reasonable-
suspicion standard; rather, the court concluded that any evidence a search
of T. L. O.'s purse was likely to produce would not have a sufficiently
direct bearing on the infraction to justify a search—a conclusion with which
we cannot agree for the reasons set forth *infra,* at 345.   JUSTICE STE-
VENS' suggestion that the New Jersey Supreme Court's decision rested on
the perceived triviality of the smoking infraction appears to be a reflection
of his own views rather than those of the New Jersey court.

ing to the court, Mr. Choplick had "a good hunch." 94 N. J., at 347, 463 A. 2d, at 942.

Both these conclusions are implausible. T. L. O. had been accused of smoking, and had denied the accusation in the strongest possible terms when she stated that she did not smoke at all. Surely it cannot be said that under these circumstances, T. L. O.'s possession of cigarettes would be irrelevant to the charges against her or to her response to those charges. T. L. O.'s possession of cigarettes, once it was discovered, would both corroborate the report that she had been smoking and undermine the credibility of her defense to the charge of smoking. To be sure, the discovery of the cigarettes would not prove that T. L. O. had been smoking in the lavatory; nor would it, strictly speaking, necessarily be inconsistent with her claim that she did not smoke at all. But it is universally recognized that evidence, to be relevant to an inquiry, need not conclusively prove the ultimate fact in issue, but only have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. Rule Evid. 401. The relevance of T. L. O.'s possession of cigarettes to the question whether she had been smoking and to the credibility of her denial that she smoked supplied the necessary "nexus" between the item searched for and the infraction under investigation. See *Warden* v. *Hayden*, 387 U. S. 294, 306–307 (1967). Thus, if Mr. Choplick in fact had a reasonable suspicion that T. L. O. had cigarettes in her purse, the search was justified despite the fact that the cigarettes, if found, would constitute "mere evidence" of a violation. *Ibid.*

Of course, the New Jersey Supreme Court also held that Mr. Choplick had no reasonable suspicion that the purse would contain cigarettes. This conclusion is puzzling. A teacher had reported that T. L. O. was smoking in the lavatory. Certainly this report gave Mr. Choplick reason to suspect that T. L. O. was carrying cigarettes with her; and

if she did have cigarettes, her purse was the obvious place in which to find them. Mr. Choplick's suspicion that there were cigarettes in the purse was not an "inchoate and unparticularized suspicion or 'hunch,'" *Terry* v. *Ohio*, 392 U. S., at 27; rather, it was the sort of "common-sense conclusio[n] about human behavior" upon which "practical people"—including government officials—are entitled to rely. *United States* v. *Cortez*, 449 U. S. 411, 418 (1981). Of course, even if the teacher's report were true, T. L. O. *might* not have had a pack of cigarettes with her; she might have borrowed a cigarette from someone else or have been sharing a cigarette with another student. But the requirement of reasonable suspicion is not a requirement of absolute certainty: "sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment . . . ." *Hill* v. *California*, 401 U. S. 797, 804 (1971). Because the hypothesis that T. L. O. was carrying cigarettes in her purse was itself not unreasonable, it is irrelevant that other hypotheses were also consistent with the teacher's accusation. Accordingly, it cannot be said that Mr. Choplick acted unreasonably when he examined T. L. O.'s purse to see if it contained cigarettes.[12]

---

[12] T. L. O. contends that even if it was reasonable for Mr. Choplick to open her purse to look for cigarettes, it was not reasonable for him to reach in and take the cigarettes out of her purse once he found them. Had he not removed the cigarettes from the purse, she asserts, he would not have observed the rolling papers that suggested the presence of marihuana, and the search for marihuana could not have taken place. T. L. O.'s argument is based on the fact that the cigarettes were not "contraband," as no school rule forbade her to have them. Thus, according to T. L. O., the cigarettes were not subject to seizure or confiscation by school authorities, and Mr. Choplick was not entitled to take them out of T. L. O.'s purse regardless of whether he was entitled to peer into the purse to see if they were there. Such hairsplitting argumentation has no place in an inquiry addressed to the issue of reasonableness. If Mr. Choplick could permissibly search T. L. O.'s purse for cigarettes, it hardly seems reasonable to suggest that his natural reaction to finding them—picking them up—could

Our conclusion that Mr. Choplick's decision to open T. L. O.'s purse was reasonable brings us to the question of the further search for marihuana once the pack of cigarettes was located. The suspicion upon which the search for marihuana was founded was provided when Mr. Choplick observed a package of rolling papers in the purse as he removed the pack of cigarettes. Although T. L. O. does not dispute the reasonableness of Mr. Choplick's belief that the rolling papers indicated the presence of marihuana, she does contend that the scope of the search Mr. Choplick conducted exceeded permissible bounds when he seized and read certain letters that implicated T. L. O. in drug dealing. This argument, too, is unpersuasive. The discovery of the rolling papers concededly gave rise to a reasonable suspicion that T. L. O. was carrying marihuana as well as cigarettes in her purse. This suspicion justified further exploration of T. L. O.'s purse, which turned up more evidence of drug-related activities: a pipe, a number of plastic bags of the type commonly used to store marihuana, a small quantity of marihuana, and a fairly substantial amount of money. Under these circumstances, it was not unreasonable to extend the search to a separate zippered compartment of the purse; and when a search of that compartment revealed an index card containing a list of "people who owe me money" as well as two letters, the inference that T. L. O. was involved in marihuana trafficking was substantial enough to justify Mr. Choplick in examining the letters to determine whether they contained any further evidence. In short, we cannot conclude that the search for marihuana was unreasonable in any respect.

Because the search resulting in the discovery of the evidence of marihuana dealing by T. L. O. was reasonable, the New Jersey Supreme Court's decision to exclude that evi-

---

be a constitutional violation. We find that neither in opening the purse nor in reaching into it to remove the cigarettes did Mr. Choplick violate the Fourth Amendment.

dence from T. L. O.'s juvenile delinquency proceedings on Fourth Amendment grounds was erroneous. Accordingly, the judgment of the Supreme Court of New Jersey is

*Reversed.*

JUSTICE POWELL, with whom JUSTICE O'CONNOR joins, concurring.

I agree with the Court's decision, and generally with its opinion. I would place greater emphasis, however, on the special characteristics of elementary and secondary schools that make it unnecessary to afford students the same constitutional protections granted adults and juveniles in a nonschool setting.

In any realistic sense, students within the school environment have a lesser expectation of privacy than members of the population generally. They spend the school hours in close association with each other, both in the classroom and during recreation periods. The students in a particular class often know each other and their teachers quite well. Of necessity, teachers have a degree of familiarity with, and authority over, their students that is unparalleled except perhaps in the relationship between parent and child. It is simply unrealistic to think that students have the same subjective expectation of privacy as the population generally. But for purposes of deciding this case, I can assume that children in school—no less than adults—have privacy interests that society is prepared to recognize as legitimate.

However one may characterize their privacy expectations, students properly are afforded some constitutional protections. In an often quoted statement, the Court said that students do not "shed their constitutional rights . . . at the schoolhouse gate." *Tinker* v. *Des Moines Independent Community School District,* 393 U. S. 503, 506 (1969). The Court also has "emphasized the need for affirming the comprehensive authority of the states and of school officials . . .

to prescribe and control conduct in the schools." *Id.*, at 507. See also *Epperson* v. *Arkansas*, 393 U. S. 97, 104 (1968). The Court has balanced the interests of the student against the school officials' need to maintain discipline by recognizing qualitative differences between the constitutional remedies to which students and adults are entitled.

In *Goss* v. *Lopez*, 419 U. S. 565 (1975), the Court recognized a constitutional right to due process, and yet was careful to limit the exercise of this right by a student who challenged a disciplinary suspension. The only process found to be "due" was notice and a hearing described as "rudimentary"; it amounted to no more than "the disciplinarian . . . informally discuss[ing] the alleged misconduct with the student minutes after it has occurred." *Id.*, at 581–582. In *Ingraham* v. *Wright*, 430 U. S. 651 (1977), we declined to extend the Eighth Amendment to prohibit the use of corporal punishment of schoolchildren as authorized by Florida law. We emphasized in that opinion that familiar constraints in the school, and also in the community, provide substantial protection against the violation of constitutional rights by school authorities. "[A]t the end of the school day, the child is invariably free to return home. Even while at school, the child brings with him the support of family and friends and is rarely apart from teachers and other pupils who may witness and protest any instances of mistreatment." *Id.*, at 670. The *Ingraham* Court further pointed out that the "openness of the public school and its supervision by the community afford significant safeguards" against the violation of constitutional rights. *Ibid.*

The special relationship between teacher and student also distinguishes the setting within which schoolchildren operate. Law enforcement officers function as adversaries of criminal suspects. These officers have the responsibility to investigate criminal activity, to locate and arrest those who violate our laws, and to facilitate the charging and bringing of such persons to trial. Rarely does this type of adversarial

relationship exist between school authorities and pupils.[1] Instead, there is a commonality of interests between teachers and their pupils. The attitude of the typical teacher is one of personal responsibility for the student's welfare as well as for his education.

The primary duty of school officials and teachers, as the Court states, is the education and training of young people. A State has a compelling interest in assuring that the schools meet this responsibility. Without first establishing discipline and maintaining order, teachers cannot begin to educate their students. And apart from education, the school has the obligation to protect pupils from mistreatment by other children, and also to protect teachers themselves from violence by the few students whose conduct in recent years has prompted national concern. For me, it would be unreasonable and at odds with history to argue that the full panoply of constitutional rules applies with the same force and effect in the schoolhouse as it does in the enforcement of criminal laws.[2]

In sum, although I join the Court's opinion and its holding,[3] my emphasis is somewhat different.

---

[1] Unlike police officers, school authorities have no law enforcement responsibility or indeed any obligation to be familiar with the criminal laws. Of course, as illustrated by this case, school authorities have a layman's familiarity with the types of crimes that occur frequently in our schools: the distribution and use of drugs, theft, and even violence against teachers as well as fellow students.

[2] As noted above, decisions of this Court have never held to the contrary. The law recognizes a host of distinctions between the rights and duties of children and those of adults. See *Goss* v. *Lopez*, 419 U. S. 565, 591 (1975) (POWELL, J., dissenting.)

[3] The Court's holding is that "when there are reasonable grounds for suspecting that [a] search will turn up evidence that the student has violated or is violating either the law or the rules of the school," a search of the student's person or belongings is justified. *Ante,* at 342. This is in accord with the Court's summary of the views of a majority of the state and federal courts that have addressed this issue. See *ante,* at 332–333, n. 2.

JUSTICE BLACKMUN, concurring in the judgment.

I join the judgment of the Court and agree with much that is said in its opinion. I write separately, however, because I believe the Court omits a crucial step in its analysis of whether a school search must be based upon probable cause. The Court correctly states that we have recognized limited exceptions to the probable-cause requirement "[w]here a careful balancing of governmental and private interests suggests that the public interest is best served" by a lesser standard. *Ante*, at 341. I believe that we have used such a balancing test, rather than strictly applying the Fourth Amendment's Warrant and Probable-Cause Clause, only when we were confronted with "a special law enforcement need for greater flexibility." *Florida* v. *Royer*, 460 U. S. 491, 514 (1983) (BLACKMUN, J., dissenting). I pointed out in *United States* v. *Place*, 462 U. S. 696 (1983):

> "While the Fourth Amendment speaks in terms of freedom from unreasonable [searches], the Amendment does not leave the reasonableness of most [searches] to the judgment of courts or government officers; the Framers of the Amendment balanced the interests involved and decided that a [search] is reasonable only if supported by a judicial warrant based on probable cause. See *Texas* v. *Brown*, 460 U. S. 730, 744–745 (1983) (POWELL, J., concurring); *United States* v. *Rabinowitz*, 339 U. S. 56, 70 (1950) (Frankfurter, J., dissenting)." *Id.*, at 722 (opinion concurring in judgment).

See also *Dunaway* v. *New York*, 442 U. S. 200, 213–214 (1979); *United States* v. *United States District Court*, 407 U. S. 297, 315–316 (1972). Only in those exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable, is a court entitled to substitute its balancing of interests for that of the Framers.

Thus, for example, in determining that police can conduct a limited "stop and frisk" upon less than probable cause, this Court relied upon the fact that "as a practical matter" the stop and frisk could not be subjected to a warrant and probable-cause requirement, because a law enforcement officer must be able to take immediate steps to assure himself that the person he has stopped to question is not armed with a weapon that could be used against him. *Terry* v. *Ohio,* 392 U. S. 1, 20–21, 23–24 (1968). Similarly, this Court's holding that a roving Border Patrol may stop a car and briefly question its occupants upon less than probable cause was based in part upon "the absence of practical alternatives for policing the border." *United States* v. *Brignoni-Ponce,* 422 U. S. 873, 881 (1975). See also *Michigan* v. *Long,* 463 U. S. 1032, 1049, n. 14 (1983); *United States* v. *Martinez-Fuerte,* 428 U. S. 543, 557 (1976); *Camara* v. *Municipal Court,* 387 U. S. 523, 537 (1967).

The Court's implication that the balancing test is the rule rather than the exception is troubling for me because it is unnecessary in this case. The elementary and secondary school setting presents a special need for flexibility justifying a departure from the balance struck by the Framers. As JUSTICE POWELL notes, "[w]ithout first establishing discipline and maintaining order, teachers cannot begin to educate their students." *Ante,* at 350. Maintaining order in the classroom can be a difficult task. A single teacher often must watch over a large number of students, and, as any parent knows, children at certain ages are inclined to test the outer boundaries of acceptable conduct and to imitate the misbehavior of a peer if that misbehavior is not dealt with quickly. Every adult remembers from his own schooldays the havoc a water pistol or peashooter can wreak until it is taken away. Thus, the Court has recognized that "[e]vents calling for discipline are frequent occurrences and sometimes require immediate, effective action." *Goss* v. *Lopez,* 419 U. S. 565, 580 (1975). Indeed, because drug use and possession of weapons have become increasingly common

among young people, an immediate response frequently is required not just to maintain an environment conducive to learning, but to protect the very safety of students and school personnel.

Such immediate action obviously would not be possible if a teacher were required to secure a warrant before searching a student. Nor would it be possible if a teacher could not conduct a necessary search until the teacher thought there was probable cause for the search. A teacher has neither the training nor the day-to-day experience in the complexities of probable cause that a law enforcement officer possesses, and is ill-equipped to make a quick judgment about the existence of probable cause. The time required for a teacher to ask the questions or make the observations that are necessary to turn reasonable grounds into probable cause is time during which the teacher, and other students, are diverted from the essential task of education. A teacher's focus is, and should be, on teaching and helping students, rather than on developing evidence against a particular troublemaker.

Education "is perhaps the most important function" of government, *Brown* v. *Board of Education*, 347 U. S. 483, 493 (1954), and government has a heightened obligation to safeguard students whom it compels to attend school. The special need for an immediate response to behavior that threatens either the safety of schoolchildren and teachers or the educational process itself justifies the Court in excepting school searches from the warrant and probable-cause requirement, and in applying a standard determined by balancing the relevant interests. I agree with the standard the Court has announced, and with its application of the standard to the facts of this case. I therefore concur in its judgment.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, concurring in part and dissenting in part.

I fully agree with Part II of the Court's opinion. Teachers, like all other government officials, must conform their

conduct to the Fourth Amendment's protections of personal privacy and personal security.  As JUSTICE STEVENS points out, *post,* at 373–374, 385–386, this principle is of particular importance when applied to schoolteachers, for children learn as much by example as by exposition.  It would be incongruous and futile to charge teachers with the task of embuing their students with an understanding of our system of constitutional democracy, while at the same time immunizing those same teachers from the need to respect constitutional protections.  See *Board of Education* v. *Pico,* 457 U. S. 853, 864–865 (1982) (plurality opinion); *West Virginia State Board of Education* v. *Barnette,* 319 U. S. 624, 637 (1943).

I do not, however, otherwise join the Court's opinion. Today's decision sanctions school officials to conduct fullscale searches on a "reasonableness" standard whose only definite content is that it is *not* the same test as the "probable cause" standard found in the text of the Fourth Amendment. In adopting this unclear, unprecedented, and unnecessary departure from generally applicable Fourth Amendment standards, the Court carves out a broad exception to standards that this Court has developed over years of considering Fourth Amendment problems.  Its decision is supported neither by precedent nor even by a fair application of the "balancing test" it proclaims in this very opinion.

I

Three basic principles underly this Court's Fourth Amendment jurisprudence.  First, warrantless searches are *per se* unreasonable, subject only to a few specifically delineated and well-recognized exceptions.  See, *e. g., Katz* v. *United States,* 389 U. S. 347, 357 (1967); accord, *Welsh* v. *Wisconsin,* 466 U. S. 740, 748–749 (1984); *United States* v. *Place,* 462 U. S. 696, 701 (1983); *Steagald* v. *United States,* 451 U. S. 204, 211–212 (1981); *Mincey* v. *Arizona,* 437 U. S. 385 (1978); *Terry* v. *Ohio,* 392 U. S. 1, 20 (1968); *Johnson* v. *United States,* 333 U. S. 10, 13–14 (1948).  Second, full-scale searches—whether conducted in accordance with the war-

rant requirement or pursuant to one of its exceptions—are "reasonable" in Fourth Amendment terms only on a showing of probable cause to believe that a crime has been committed and that evidence of the crime will be found in the place to be searched. *Beck* v. *Ohio*, 379 U. S. 89, 91 (1964); *Wong Sun* v. *United States*, 371 U. S. 471, 479 (1963); *Brinegar* v. *United States*, 338 U. S. 160, 175–176 (1949). Third, categories of intrusions that are substantially less intrusive than full-scale searches or seizures may be justifiable in accordance with a balancing test even absent a warrant or probable cause, provided that the balancing test used gives sufficient weight to the privacy interests that will be infringed. *Dunaway* v. *New York*, 442 U. S. 200, 210 (1979); *Terry* v. *Ohio, supra.*

Assistant Vice Principal Choplick's thorough excavation of T. L. O.'s purse was undoubtedly a serious intrusion on her privacy. Unlike the searches in *Terry* v. *Ohio, supra,* or *Adams* v. *Williams*, 407 U. S. 143 (1972), the search at issue here encompassed a detailed and minute examination of respondent's pocketbook, in which the contents of private papers and letters were thoroughly scrutinized.[1] Wisely, neither petitioner nor the Court today attempts to justify the search of T. L. O.'s pocketbook as a minimally intrusive search in the *Terry* line. To be faithful to the Court's settled doctrine, the inquiry therefore must focus on the warrant and probable-cause requirements.

## A

I agree that schoolteachers or principals, when not acting as agents of law enforcement authorities, generally may conduct a search of their students' belongings without first

---

[1] A purse typically contains items of highly personal nature. Especially for shy or sensitive adolescents, it could prove extremely embarrassing for a teacher or principal to rummage through its contents, which could include notes from friends, fragments of love poems, caricatures of school authorities, and items of personal hygiene.

obtaining a warrant. To agree with the Court on this point is to say that school searches may justifiably be held to that extent to constitute an exception to the Fourth Amendment's warrant requirement. Such an exception, however, is not to be justified, as the Court apparently holds, by assessing net social value through application of an unguided "balancing test" in which "the individual's legitimate expectations of privacy and personal security" are weighed against "the government's need for effective methods to deal with breaches of public order." *Ante,* at 337. The Warrant Clause is something more than an exhortation to this Court to maximize social welfare as *we* see fit. It requires that the authorities must obtain a warrant before conducting a full-scale search. The undifferentiated governmental interest in law enforcement is insufficient to justify an exception to the warrant requirement. Rather, some *special* governmental interest beyond the need merely to apprehend lawbreakers is necessary to justify a categorical exception to the warrant requirement. For the most part, special governmental needs sufficient to override the warrant requirement flow from "exigency"—that is, from the press of time that makes obtaining a warrant either impossible or hopelessly infeasible. See *United States* v. *Place, supra,* at 701–702; *Mincey* v. *Arizona, supra,* at 393–394; *Johnson* v. *United States, supra,* at 15. Only after finding an extraordinary governmental interest of this kind do we—or ought we—engage in a balancing test to determine if a warrant should nonetheless be required.[2]

---

[2] Administrative search cases involving inspection schemes have recognized that "if inspection is to be effective and serve as a credible deterrent, unannounced, even frequent, inspections are essential. In this context, the prerequisite of a warrant could easily frustrate inspection . . . ." *United States* v. *Biswell,* 406 U. S. 311, 316 (1972); accord, *Donovan* v. *Dewey,* 452 U. S. 594, 603 (1981). Cf. *Marshall* v. *Barlow's, Inc.,* 436 U. S. 307 (1978) (holding that a warrant is nonetheless necessary in some administrative search contexts).

To require a showing of some extraordinary governmental interest before dispensing with the warrant requirement is not to undervalue society's need to apprehend violators of the criminal law. To be sure, forcing law enforcement personnel to obtain a warrant before engaging in a search will predictably deter the police from conducting some searches that they would otherwise like to conduct. But this is not an unintended *result* of the Fourth Amendment's protection of privacy; rather, it is the very *purpose* for which the Amendment was thought necessary. Only where the governmental interests at stake exceed those implicated in any ordinary law enforcement context—that is, only where there is some extraordinary governmental interest involved—is it legitimate to engage in a balancing test to determine whether a warrant is indeed necessary.

In this case, such extraordinary governmental interests do exist and are sufficient to justify an exception to the warrant requirement. Students are necessarily confined for most of the schoolday in close proximity to each other and to the school staff. I agree with the Court that we can take judicial notice of the serious problems of drugs and violence that plague our schools. As JUSTICE BLACKMUN notes, teachers must not merely "maintain an environment conducive to learning" among children who "are inclined to test the outer boundaries of acceptable conduct," but must also "protect the very safety of students and school personnel." *Ante*, at 352–353. A teacher or principal could neither carry out essential teaching functions nor adequately protect students' safety if required to wait for a warrant before conducting a necessary search.

B

I emphatically disagree with the Court's decision to cast aside the constitutional probable-cause standard when assessing the constitutional validity of a schoolhouse search. The Court's decision jettisons the probable-cause standard— the only standard that finds support in the text of the Fourth

Amendment—on the basis of its Rohrschach-like "balancing test." Use of such a "balancing test" to determine the standard for evaluating the validity of a full-scale search represents a sizable innovation in Fourth Amendment analysis. This innovation finds support neither in precedent nor policy and portends a dangerous weakening of the purpose of the Fourth Amendment to protect the privacy and security of our citizens. Moreover, even if this Court's historic understanding of the Fourth Amendment were mistaken and a balancing test of some kind were appropriate, any such test that gave adequate weight to the privacy and security interests protected by the Fourth Amendment would not reach the preordained result the Court's conclusory analysis reaches today. Therefore, because I believe that the balancing test used by the Court today is flawed both in its inception and in its execution, I respectfully dissent.

1

An unbroken line of cases in this Court have held that probable cause is a prerequisite for a full-scale search. In *Carroll* v. *United States*, 267 U. S. 132, 149 (1925), the Court held that "[o]n reason and authority the true rule is that if the search and seizure . . . are made upon probable cause . . . the search and seizure are valid." Under our past decisions probable cause—which exists where "the facts and circumstances within [the officials'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief" that a criminal offense had occurred and the evidence would be found in the suspected place, *id.*, at 162—is the constitutional minimum for justifying a full-scale search, regardless of whether it is conducted pursuant to a warrant or, as in *Carroll*, within one of the exceptions to the warrant requirement. *Henry* v. *United States*, 361 U. S. 98, 104 (1959) (*Carroll* "merely relaxed the requirements for a warrant on grounds of practicality," but "did not dispense

with the need for probable cause"); accord, *Chambers* v. *Maroney*, 399 U. S. 42, 51 (1970) ("In enforcing the Fourth Amendment's prohibition against unreasonable searches and seizures, the Court has insisted upon probable cause as a minimum requirement for a reasonable search permitted by the Constitution").[3]

Our holdings that probable cause is a prerequisite to a full-scale search are based on the relationship between the two Clauses of the Fourth Amendment. The first Clause ("The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated . . .") states the purpose of the Amendment and its coverage. The second Clause (". . . and no Warrants shall issue but upon probable cause . . .") gives content to the word "unreasonable" in the first Clause. "For all but . . . narrowly defined intrusions, the requisite 'balancing' has been performed in centuries of precedent and is embodied in the principle that seizures are 'reasonable' only if supported by probable cause." *Dunaway* v. *New York*, 442 U. S., at 214.

I therefore fully agree with the Court that "the underlying command of the Fourth Amendment is always that searches and seizures be reasonable." *Ante*, at 337. But this "underlying command" is not directly interpreted in each category of cases by some amorphous "balancing test." Rather, the provisions of the Warrant Clause—a warrant and probable cause—provide the yardstick against which official searches

---

[3] In fact, despite the somewhat diminished expectation of privacy that this Court has recognized in the automobile context, see *South Dakota* v. *Opperman*, 428 U. S. 364, 367–368 (1976), we have required probable cause even to justify a warrantless automobile search, see *United States* v. *Ortiz*, 422 U. S. 891, 896 (1975) ("A search, even of an automobile, is a substantial invasion of privacy. To protect that privacy from official arbitrariness, the Court always has regarded probable cause as the minimum requirement for a lawful search") (footnote omitted); *Chambers* v. *Maroney*, 399 U. S., at 51.

and seizures are to be measured. The Fourth Amendment neither requires nor authorizes the conceptual free-for-all that ensues when an unguided balancing test is used to assess specific categories of searches. If the search in question is more than a minimally intrusive *Terry* stop, the constitutional probable-cause standard determines its validity.

To be sure, the Court recognizes that probable cause "ordinarily" is required to justify a full-scale search and that the existence of probable cause "bears on" the validity of the search. *Ante*, at 340–341. Yet the Court fails to cite any case in which a full-scale intrusion upon privacy interests has been justified on less than probable cause. The line of cases begun by *Terry* v. *Ohio*, 392 U. S. 1 (1968), provides no support, for they applied a balancing test only in the context of minimally intrusive searches that served crucial law enforcement interests. The search in *Terry* itself, for instance, was a "limited search of the outer clothing." *Id.*, at 30. The type of border stop at issue in *United States* v. *Brignoni-Ponce*, 422 U. S. 873, 880 (1975), usually "consume[d] no more than a minute"; the Court explicitly noted that "any further detention . . . must be based on consent or probable cause." *Id.*, at 882. See also *United States* v. *Hensley*, *ante*, at 224 (momentary stop); *United States* v. *Place*, 462 U. S., at 706–707 (brief detention of luggage for canine "sniff"); *Pennsylvania* v. *Mimms*, 434 U. S. 106 (1977) *(per curiam)* (brief frisk after stop for traffic violation); *United States* v. *Martinez-Fuerte*, 428 U. S. 543, 560 (1976) (characterizing intrusion as "minimal"); *Adams* v. *Williams*, 407 U. S. 143 (1972) (stop and frisk). In short, all of these cases involved " 'seizures' so substantially less intrusive than arrests that the general rule requiring probable cause to make Fourth Amendment 'seizures' reasonable could be replaced by a balancing test." *Dunaway*, *supra*, at 210.

Nor do the "administrative search" cases provide any comfort for the Court. In *Camara* v. *Municipal Court*, 387 U. S. 523 (1967), the Court held that the probable-cause standard governed even administrative searches. Although

the *Camara* Court recognized that probable-cause standards themselves may have to be somewhat modified to take into account the special nature of administrative searches, the Court did so only after noting that "because [housing code] inspections are neither personal in nature nor aimed at the discovery of evidence of crime, they involve a relatively limited invasion of the urban citizen's privacy." *Id.*, at 537. Subsequent administrative search cases have similarly recognized that such searches intrude upon areas whose owners harbor a significantly decreased expectation of privacy, see, *e. g., Donovan* v. *Dewey*, 452 U. S. 594, 598–599 (1981), thus circumscribing the injury to Fourth Amendment interests caused by the search.

Considerations of the deepest significance for the freedom of our citizens counsel strict adherence to the principle that no search may be conducted where the official is not in possession of probable cause—that is, where the official does not know of "facts and circumstances [that] warrant a prudent man in believing that the offense has been committed." *Henry* v. *United States*, 361 U. S., at 102; see also *id.*, at 100–101 (discussing history of probable-cause standard). The Fourth Amendment was designed not merely to protect against official intrusions whose social utility was less as measured by some "balancing test" than its intrusion on individual privacy; it was designed in addition to grant the individual a zone of privacy whose protections could be breached only where the "reasonable" requirements of the probable-cause standard were met. Moved by whatever momentary evil has aroused their fears, officials—perhaps even supported by a majority of citizens—may be tempted to conduct searches that sacrifice the liberty of each citizen to assuage the perceived evil.[4] But the Fourth Amendment

---

[4] As Justice Stewart said in *Coolidge* v. *New Hampshire*, 403 U. S. 443, 455 (1971): "In times of unrest, whether caused by crime or racial conflict or fear of internal subversion, this basic law and the values that it represents may appear unrealistic or 'extravagant' to some. But the values were those of the authors of our fundamental constitutional concepts."

rests on the principle that a true balance between the individual and society depends on the recognition of "the right to be let alone—the most comprehensive of rights and the right most valued by civilized men." *Olmstead* v. *United States*, 277 U. S. 438, 478 (1928) (Brandeis, J., dissenting). That right protects the privacy and security of the individual unless the authorities can cross a specific threshold of need, designated by the term "probable cause." I cannot agree with the Court's assertions today that a "balancing test" can replace the constitutional threshold with one that is more convenient for those enforcing the laws but less protective of the citizens' liberty; the Fourth Amendment's protections should not be defaced by "a balancing process that overwhelms the individual's protection against unwarranted official intrusion by a governmental interest said to justify the search and seizure." *United States* v. *Martinez-Fuerte*, *supra*, at 570 (BRENNAN, J., dissenting).

2

I thus do not accept the majority's premise that "[t]o hold that the Fourth Amendment applies to searches conducted by school authorities is only to begin the inquiry into the standards governing such searches." *Ante*, at 337. For me, the finding that the Fourth Amendment applies, coupled with the observation that what is at issue is a full-scale search, is the end of the inquiry. But even if I believed that a "balancing test" appropriately replaces the judgment of the Framers of the Fourth Amendment, I would nonetheless object to the cursory and shortsighted "test" that the Court employs to justify its predictable weakening of Fourth Amendment protections. In particular, the test employed by the Court vastly overstates the social costs that a probable-cause standard entails and, though it plausibly articulates the serious privacy interests at stake, inexplicably fails to accord them adequate weight in striking the balance.

The Court begins to articulate its "balancing test" by observing that "the government's need for effective methods to deal with breaches of public order" is to be weighed on one side of the balance. *Ibid.* Of course, this is not correct. It is not the government's need for effective enforcement methods that should weigh in the balance, for ordinary Fourth Amendment standards—including probable cause— may well permit methods for maintaining the public order that are perfectly effective. If that were the case, the governmental interest in having effective standards would carry no weight at all as a justification for *departing* from the probable-cause standard. Rather, it is the costs of applying probable cause as opposed to applying some lesser standard that should be weighed on the government's side.[5]

In order to tote up the costs of applying the probable-cause standard, it is thus necessary first to take into account the nature and content of that standard, and the likelihood that it would hamper achievement of the goal—vital not just to "teachers and administrators," see *ante*, at 339—of maintaining an effective educational setting in the public schools. The seminal statement concerning the nature of the probable-cause standard is found in *Carroll* v. *United States*, 267 U. S. 132 (1925). *Carroll* held that law enforcement authorities have probable cause to search where "the facts and circumstances within their knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to

---

[5] I speak of the "government's side" only because it is the terminology used by the Court. In my view, this terminology itself is seriously misleading. The government is charged with protecting the privacy and security of the citizen, just as it is charged with apprehending those who violate the criminal law. Consequently, the government has *no* legitimate interest in conducting a search that unduly intrudes on the privacy and security of the citizen. The balance is not between the rights of the government and the rights of the citizen, but between opposing conceptions of the constitutionally legitimate means of carrying out the government's varied responsibilities.

warrant a man of reasonable caution in the belief" that a criminal offense had occurred. *Id.*, at 162. In *Brinegar* v. *United States*, 338 U. S. 160 (1949), the Court amplified this requirement, holding that probable cause depends upon "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.*, at 175.

Two Terms ago, in *Illinois* v. *Gates*, 462 U. S. 213 (1983), this Court expounded at some length its view of the probable-cause standard. Among the adjectives used to describe the standard were "practical," "fluid," "flexible," "easily applied," and "nontechnical." See *id.*, at 232, 236, 239. The probable-cause standard was to be seen as a "common-sense" test whose application depended on an evaluation of the "totality of the circumstances." *Id.*, at 238.

Ignoring what *Gates* took such great pains to emphasize, the Court today holds that a new "reasonableness" standard is appropriate because it "will spare teachers and school administrators the necessity of schooling themselves in the niceties of probable cause and permit them to regulate their conduct according to the dictates of reason and common sense." *Ante*, at 343. I had never thought that our pre-*Gates* understanding of probable cause defied either reason or common sense. But after *Gates*, I would have thought that there could be no doubt that this "nontechnical," "practical," and "easily applied" concept was eminently serviceable in a context like a school, where teachers require the flexibility to respond quickly and decisively to emergencies.

A consideration of the likely operation of the probable-cause standard reinforces this conclusion. Discussing the issue of school searches, Professor LaFave has noted that the cases that have reached the appellate courts "strongly suggest that in most instances the evidence of wrongdoing prompting teachers or principals to conduct searches is sufficiently detailed and specific to meet the traditional probable cause test." 3 W. LaFave, Search and Seizure § 10.11,

pp. 459–460 (1978).[6]    The problems that have caused this Court difficulty in interpreting the probable-cause standard have largely involved informants, see, *e. g., Illinois* v. *Gates, supra; Spinelli* v. *United States,* 393 U. S. 410 (1969); *Aguilar* v. *Texas,* 378 U. S. 108 (1964); *Draper* v. *United States,* 358 U. S. 307 (1959).    However, three factors make it likely that problems involving informants will not make it difficult for teachers and school administrators to make probable-cause decisions.    This Court's decision in *Gates* applying a "totality of the circumstances" test to determine whether an informant's tip can constitute probable cause renders the test easy for teachers to apply.    The fact that students and teachers interact daily in the school building makes it more likely that teachers will get to know students who supply information; the problem of informants who remain anonymous even to the teachers—and who are therefore unavailable for verification or further questioning—is unlikely to arise.    Finally, teachers can observe the behavior of students under suspicion to corroborate any doubtful tips they do receive.

As compared with the relative ease with which teachers can apply the probable-cause standard, the amorphous "reasonableness under all the circumstances" standard freshly coined by the Court today will likely spawn increased litigation and greater uncertainty among teachers and administrators.    Of course, as this Court should know, an essential purpose of developing and articulating legal norms is to enable individuals to conform their conduct to those norms. A school system conscientiously attempting to obey the Fourth Amendment's dictates under a probable-cause standard could, for example, consult decisions and other legal materials and prepare a booklet expounding the rough outlines of the concept.    Such a booklet could be distributed to

---

[6] It should be noted that Professor LaFave reached this conclusion in 1978, *before* this Court's decision in *Gates* made clear the "flexibility" of the probable-cause concept.

teachers to provide them with guidance as to when a search may be lawfully conducted. I cannot but believe that the same school system faced with interpreting what is permitted under the Court's new "reasonableness" standard would be hopelessly adrift as to when a search may be permissible. The sad result of this uncertainty may well be that some teachers will be reluctant to conduct searches that are fully permissible and even necessary under the constitutional probable-cause standard, while others may intrude arbitrarily and unjustifiably on the privacy of students.[7]

One further point should be taken into account when considering the desirability of replacing the constitutional probable-cause standard. The question facing the Court is not whether the probable-cause standard should be replaced by a test of "reasonableness under all the circumstances." Rather, it is whether traditional Fourth Amendment standards should recede before the Court's new standard. Thus, although the Court today paints with a broad brush and holds its undefined "reasonableness" standard applicable to *all* school searches, I would approach the question with considerably more reserve. I would not think it necessary to develop a single standard to govern all school searches, any more

---

[7] A comparison of the language of the standard ("reasonableness under all the circumstances") with the traditional language of probable cause ("facts sufficient to warrant a person of reasonable caution in believing that a crime had been committed and the evidence would be found in the designated place") suggests that the Court's new standard may turn out to be probable cause under a new guise. If so, the additional uncertainty caused by this Court's innovation is surely unjustifiable; it would be naive to expect that the addition of this extra dose of uncertainty would do anything other than "burden the efforts of school authorities to maintain order in their schools," *ante*, at 342. If, on the other hand, the new standard permits searches of students in instances when probable cause is absent— instances, according to this Court's consistent formulations, when a person of reasonable caution would not think it likely that a violation existed or that evidence of that violation would be found—the new standard is genuinely objectionable and impossible to square with the premise that our citizens have the right to be free from arbitrary intrusions on their privacy.

than traditional Fourth Amendment law applies even the probable-cause standard to *all* searches and seizures. For instance, just as police officers may conduct a brief stop and frisk on something less than probable cause, so too should teachers be permitted the same flexibility. A teacher or administrator who had reasonable suspicion that a student was carrying a gun would no doubt have authority under ordinary Fourth Amendment doctrine to conduct a limited search of the student to determine whether the threat was genuine. The "costs" of applying the traditional probable-cause standard must therefore be discounted by the fact that, where additional flexibility is necessary and where the intrusion is minor, traditional Fourth Amendment jurisprudence itself displaces probable cause when it determines the validity of a search.

A legitimate balancing test whose function was something more substantial than reaching a predetermined conclusion acceptable to this Court's impressions of what authority teachers need would therefore reach rather a different result than that reached by the Court today. On one side of the balance would be the costs of applying traditional Fourth Amendment standards—the "practical" and "flexible" probable-cause standard where a full-scale intrusion is sought, a lesser standard in situations where the intrusion is much less severe and the need for greater authority compelling. Whatever costs were toted up on this side would have to be discounted by the costs of applying an unprecedented and ill-defined "reasonableness under all the circumstances" test that will leave teachers and administrators uncertain as to their authority and will encourage excessive fact-based litigation.

On the other side of the balance would be the serious privacy interests of the student, interests that the Court admirably articulates in its opinion, *ante*, at 337–339, but which the Court's new ambiguous standard places in serious jeopardy. I have no doubt that a fair assessment of the two

sides of the balance would necessarily reach the same conclusion that, as I have argued above, the Fourth Amendment's language compels—that school searches like that conducted in this case are valid only if supported by probable cause.

## II

Applying the constitutional probable-cause standard to the facts of this case, I would find that Mr. Choplick's search violated T. L. O.'s Fourth Amendment rights. After escorting T. L. O. into his private office, Mr. Choplick demanded to see her purse. He then opened the purse to find evidence of whether she had been smoking in the bathroom. When he opened the purse, he discovered the pack of cigarettes. At this point, his search for evidence of the smoking violation was complete.

Mr. Choplick then noticed, below the cigarettes, a pack of cigarette rolling papers. Believing that such papers were "associated," see *ante*, at 328, with the use of marihuana, he proceeded to conduct a detailed examination of the contents of her purse, in which he found some marihuana, a pipe, some money, an index card, and some private letters indicating that T. L. O. had sold marihuana to other students. The State sought to introduce this latter material in evidence at a criminal proceeding, and the issue before the Court is whether it should have been suppressed.

On my view of the case, we need not decide whether the initial search conducted by Mr. Choplick—the search for evidence of the smoking violation that was completed when Mr. Choplick found the pack of cigarettes—was valid. For Mr. Choplick at that point did not have probable cause to continue to rummage through T. L. O.'s purse. Mr. Choplick's suspicion of marihuana possession at this time was based *solely* on the presence of the package of cigarette papers. The mere presence without more of such a staple item of commerce is insufficient to warrant a person of reasonable caution in inferring both that T. L. O. had violated the law

by possessing marihuana and that evidence of that violation would be found in her purse. Just as a police officer could not obtain a warrant to search a home based solely on his claim that he had seen a package of cigarette papers in that home, Mr. Choplick was not entitled to search possibly the most private possessions of T. L. O. based on the mere presence of a package of cigarette papers. Therefore, the fruits of this illegal search must be excluded and the judgment of the New Jersey Supreme Court affirmed.

## III

In the past several Terms, this Court has produced a succession of Fourth Amendment opinions in which "balancing tests" have been applied to resolve various questions concerning the proper scope of official searches. The Court has begun to apply a "balancing test" to determine whether a particular category of searches intrudes upon expectations of privacy that merit Fourth Amendment protection. See *Hudson* v. *Palmer*, 468 U. S. 517, 527 (1984) ("Determining whether an expectation of privacy is 'legitimate' or 'reasonable' necessarily entails a balancing of interests"). It applies a "balancing test" to determine whether a warrant is necessary to conduct a search. See *ante*, at 340; *United States* v. *Martinez-Fuerte*, 428 U. S., at 564–566. In today's opinion, it employs a "balancing test" to determine what standard should govern the constitutionality of a given category of searches. See *ante*, at 340–341. Should a search turn out to be unreasonable after application of all of these "balancing tests," the Court then applies an additional "balancing test" to decide whether the evidence resulting from the search must be excluded. See *United States* v. *Leon*, 468 U. S. 897 (1984).

All of these "balancing tests" amount to brief nods by the Court in the direction of a neutral utilitarian calculus while the Court in fact engages in an unanalyzed exercise of judicial will. Perhaps this doctrinally destructive nihilism is merely

a convenient umbrella under which a majority that cannot agree on a genuine rationale can conceal its differences. Compare *ante*, p. 327 (WHITE, J., delivering the opinion of the Court), with *ante*, p. 348 (POWELL, J., joined by O'CONNOR, J., concurring), and *ante*, p. 351 (BLACKMUN, J., concurring in judgment). And it may be that the real force underlying today's decision is the belief that the Court purports to reject—the belief that the unique role served by the schools justifies an exception to the Fourth Amendment on their behalf. If so, the methodology of today's decision may turn out to have as little influence in future cases as will its result, and the Court's departure from traditional Fourth Amendment doctrine will be confined to the schools.

On my view, the presence of the word "unreasonable" in the text of the Fourth Amendment does not grant a shifting majority of this Court the authority to answer *all* Fourth Amendment questions by consulting its momentary vision of the social good. Full-scale searches unaccompanied by probable cause violate the Fourth Amendment. I do not pretend that our traditional Fourth Amendment doctrine automatically answers all of the difficult legal questions that occasionally arise. I do contend, however, that this Court has an obligation to provide some coherent framework to resolve such questions on the basis of more than a conclusory recitation of the results of a "balancing test." The Fourth Amendment itself supplies that framework and, because the Court today fails to heed its message, I must respectfully dissent.

JUSTICE STEVENS, with whom JUSTICE MARSHALL joins, and with whom JUSTICE BRENNAN joins as to Part I, concurring in part and dissenting in part.

Assistant Vice Principal Choplick searched T. L. O.'s purse for evidence that she was smoking in the girls' restroom. Because T. L. O.'s suspected misconduct was not illegal and did not pose a serious threat to school discipline, the New Jersey Supreme Court held that Choplick's search

of her purse was an unreasonable invasion of her privacy and that the evidence which he seized could not be used against her in criminal proceedings. The New Jersey court's holding was a careful response to the case it was required to decide.

The State of New Jersey sought review in this Court, first arguing that the exclusionary rule is wholly inapplicable to searches conducted by school officials, and then contending that the Fourth Amendment itself provides no protection at all to the student's privacy. The Court has accepted neither of these frontal assaults on the Fourth Amendment. It has, however, seized upon this "no smoking" case to announce "the proper standard" that should govern searches by school officials who are confronted with disciplinary problems far more severe than smoking in the restroom. Although I join Part II of the Court's opinion, I continue to believe that the Court has unnecessarily and inappropriately reached out to decide a constitutional question. See 468 U. S. 1214 (1984) (STEVENS, J., dissenting from reargument order). More importantly, I fear that the concerns that motivated the Court's activism have produced a holding that will permit school administrators to search students suspected of violating only the most trivial school regulations and guidelines for behavior.

## I

The question the Court decides today—whether Mr. Choplick's search of T. L. O.'s purse violated the Fourth Amendment—was not raised by the State's petition for writ of certiorari. That petition only raised one question: "Whether the Fourth Amendment's exclusionary rule applies to searches made by public school officials and teachers in school."[1] The State quite properly declined to submit the former question because "[it] did not wish to present what might appear to be solely a factual dispute to this Court."[2]

---

[1] Pet. for Cert. i.

[2] Supplemental Brief for Petitioner 6.

Since this Court has twice had the threshold question argued, I believe that it should expressly consider the merits of the New Jersey Supreme Court's ruling that the exclusionary rule applies.

The New Jersey Supreme Court's holding on this question is plainly correct. As the state court noted, this case does not involve the use of evidence in a school disciplinary proceeding; the juvenile proceedings brought against T. L. O. involved a charge that would have been a criminal offense if committed by an adult.[3] Accordingly, the exclusionary rule issue decided by that court and later presented to this Court concerned only the use in a criminal proceeding of evidence obtained in a search conducted by a public school administrator.

Having confined the issue to the law enforcement context, the New Jersey court then reasoned that this Court's cases have made it quite clear that the exclusionary rule is equally applicable "whether the public official who illegally obtained the evidence was a municipal inspector, *See* v. *Seattle* 387 U. S. 541 [1967]; *Camara* [v. *Municipal Court,*] 387 U. S. 523 [1967]; a firefighter, *Michigan* v. *Tyler*, 436 U. S. 499, 506 [1978]; or a school administrator or law enforcement official."[4] It correctly concluded "that if an official search violates constitutional rights, the evidence is not admissible in criminal proceedings."[5]

When a defendant in a criminal proceeding alleges that she was the victim of an illegal search by a school administrator, the application of the exclusionary rule is a simple corollary of the principle that "all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court." *Mapp* v. *Ohio*, 367 U. S. 643, 655 (1961). The practical basis for this principle is, in part, its deterrent effect, see *id.*, at 656, and as a general

---

[3] *State ex rel. T. L. O.*, 94 N. J. 331, 337, nn. 1 and 2, 342, n. 5, 463 A. 2d 934, 937, nn. 1 and 2, 939, n. 5 (1983).

[4] *Id.*, at 341, 463 A. 2d, at 939.

[5] *Id.*, at 341–342, 463 A. 2d, at 939.

matter it is tolerably clear to me, as it has been to the Court, that the existence of an exclusionary remedy does deter the authorities from violating the Fourth Amendment by sharply reducing their incentive to do so.[6]  In the case of evidence obtained in school searches, the "overall educative effect"[7] of the exclusionary rule adds important symbolic force to this utilitarian judgment.

Justice Brandeis was both a great student and a great teacher.  It was he who wrote:

> "Our Government is the potent, the omnipresent teacher.  For good or for ill, it teaches the whole people by its example.  Crime is contagious.  If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy."  *Olmstead* v. *United States*, 277 U. S. 438, 485 (1928) (dissenting opinion).

Those of us who revere the flag and the ideals for which it stands believe in the power of symbols.  We cannot ignore that rules of law also have a symbolic power that may vastly exceed their utility.

Schools are places where we inculcate the values essential to the meaningful exercise of rights and responsibilities by a self-governing citizenry.[8]  If the Nation's students can be convicted through the use of arbitrary methods destructive of personal liberty, they cannot help but feel that they have

---

[6] See, *e. g., Stone* v. *Powell*, 428 U. S. 465, 492 (1976); *United States* v. *Janis*, 428 U. S. 433, 453 (1976); *United States* v. *Calandra*, 414 U. S. 338, 347–348 (1974); *Alderman* v. *United States*, 394 U. S. 165, 174–175 (1969).

[7] *Stone* v. *Powell*, 428 U. S., at 493.

[8] See *Board of Education* v. *Pico*, 457 U. S. 853, 864–865 (1982) (BRENNAN, J., joined by MARSHALL and STEVENS, JJ.); *id.,* at 876, 880 (BLACKMUN, J., concurring in part and concurring in judgment); *Plyler* v. *Doe*, 457 U. S. 202, 221 (1982); *Ambach* v. *Norwick*, 441 U. S. 68, 76 (1979); *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, 507, 511–513 (1969); *Brown* v. *Board of Education*, 347 U. S. 483, 493 (1954); *West Virginia State Board of Education* v. *Barnette*, 319 U. S. 624, 637 (1943).

been dealt with unfairly.[9]    The application of the exclusionary rule in criminal proceedings arising from illegal school searches makes an important statement to young people that "our society attaches serious consequences to a violation of constitutional rights,"[10] and that this is a principle of "liberty and justice for all."[11]

Thus, the simple and correct answer to the question presented by the State's petition for certiorari would have required affirmance of a state court's judgment suppressing evidence.    That result would have been dramatically out of character for a Court that not only grants prosecutors relief from suppression orders with distressing regularity,[12] but

---

[9] Cf. *In re Gault,* 387 U. S. 1, 26–27 (1967).    JUSTICE BRENNAN has written of an analogous case:

"We do not know what class petitioner was attending when the police and dogs burst in, but the lesson the school authorities taught her that day will undoubtedly make a greater impression than the one her teacher had hoped to convey.    I would grant certiorari to teach petitioner another lesson: that the Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures' . . . .    Schools cannot expect their students to learn the lessons of good citizenship when the school authorities themselves disregard the fundamental principles underpinning our constitutional freedoms." *Doe* v. *Renfrow,* 451 U. S. 1022, 1027–1028 (1981) (dissenting from denial of certiorari).

[10] *Stone* v. *Powell,* 428 U. S., at 492.

[11] 36 U. S. C. § 172 (pledge of allegiance to the flag).

[12] A brief review of the Fourth Amendment cases involving criminal prosecutions since the October Term, 1982, supports the proposition.    Compare *Florida* v. *Rodriguez, ante,* p. 1 *(per curiam); United States* v. *Leon,* 468 U. S. 897 (1984); *Massachusetts* v. *Sheppard,* 468 U. S. 981 (1984); *Segura* v. *United States,* 468 U. S. 796 (1984); *United States* v. *Karo,* 468 U. S. 705 (1984); *Oliver* v. *United States,* 466 U. S. 170 (1984); *United States* v. *Jacobsen,* 466 U. S. 109 (1984); *Massachusetts* v. *Upton,* 466 U. S. 727 (1984) *(per curiam); Florida* v. *Meyers,* 466 U. S. 380 (1984) *(per curiam); Michigan* v. *Long,* 463 U. S. 1032 (1983); *Illinois* v. *Andreas,* 463 U. S. 765 (1983); *Illinois* v. *Lafayette,* 462 U. S. 640 (1983); *United States* v. *Villamonte-Marquez,* 462 U. S. 579 (1983); *Illinois* v. *Gates,* 462 U. S. 213 (1983); *Texas* v. *Brown,* 460 U. S. 730 (1983); *United States* v. *Knotts,*

also is prone to rely on grounds not advanced by the parties in order to protect evidence from exclusion.[13]    In characteristic disregard of the doctrine of judicial restraint, the Court avoided that result in this case by ordering reargument and directing the parties to address a constitutional question that the parties, with good reason, had not asked the Court to decide.    Because judicial activism undermines the Court's power to perform its central mission in a legitimate way, I dissented from the reargument order.    See 468 U. S. 1214 (1984).    I have not modified the views expressed in that dissent, but since the majority has brought the question before us, I shall explain why I believe the Court has misapplied the standard of reasonableness embodied in the Fourth Amendment.

## II

The search of a young woman's purse by a school administrator is a serious invasion of her legitimate expectations of privacy.    A purse "is a common repository for one's personal effects and therefore is inevitably associated with the expectation of privacy." *Arkansas* v. *Sanders*, 442 U. S. 753, 762 (1979).    Although such expectations must sometimes yield to the legitimate requirements of government, in assessing the constitutionality of a warrantless search, our decision must be guided by the language of the Fourth Amendment: "The right of the people to be secure in their persons, houses,

---

460 U. S. 276 (1983); *Illinois* v. *Batchelder*, 463 U. S. 1112 (1983) *(per curiam); Cardwell* v. *Taylor*, 461 U. S. 571 (1983) *(per curiam)*, with *Thompson* v. *Louisiana, ante*, p. 17 *(per curiam); Welsh* v. *Wisconsin*, 466 U. S. 740 (1984); *Michigan* v. *Clifford*, 464 U. S. 287 (1984); *United States* v. *Place*, 462 U. S. 696 (1983); *Florida* v. *Royer*, 460 U. S. 491 (1983).

[13] *E. g. United States* v. *Karo*, 468 U. S., at 719–721; see also *Segura* v. *United States*, 468 U. S., at 805–813 (opinion of BURGER, C. J., joined by O'CONNOR, J.); cf. *Illinois* v. *Gates*, 459 U. S. 1028 (1982) (STEVENS, J., dissenting from reargument order, joined by BRENNAN and MARSHALL, JJ.)

papers and effects, against *unreasonable* searches and seizures, shall not be violated . . . ." In order to evaluate the reasonableness of such searches, "it is necessary 'first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen,' for there is 'no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails.'" *Terry* v. *Ohio,* 392 U. S. 1, 20–21 (1968) (quoting *Camara* v. *Municipal Court,* 387 U. S. 523, 528, 534–537, (1967)).[14]

The "limited search for weapons" in *Terry* was justified by the "immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." 392 U. S., at 23, 25. When viewed from the institutional perspective, "the substantial need of teachers and administrators for freedom to maintain order in the schools," *ante,* at 341 (majority opinion), is no less acute. Violent, unlawful, or seriously disruptive conduct is fundamentally inconsistent with the principal function of teaching institutions which is to educate young people and prepare them for citizenship.[15] When such conduct occurs amidst a sizable group of impressionable young people, it creates an explosive atmosphere that requires a prompt and effective response.

Thus, warrantless searches of students by school administrators are reasonable when undertaken for those purposes.

---

[14] See also *United States* v. *Brigoni-Ponce,* 422 U. S. 873, 881–882 (1975); *United States* v. *Martinez-Fuerte,* 428 U. S. 543, 567 (1976).

[15] Cf. *ante,* at 353 (BLACKMUN, J., concurring in judgment) ("The special need for an immediate response to behavior that threatens either the safety of schoolchildren and teachers or the educational process itself justifies the Court in excepting school searches from the warrant and probable-cause requirement"); *ante,* at 350 (POWELL, J., concurring, joined by O'CONNOR, J.) ("Without first establishing discipline and maintaining order, teachers cannot begin to educate their students").

But the majority's statement of the standard for evaluating the reasonableness of such searches is not suitably adapted to that end. The majority holds that "a search of a student by a teacher or other school official will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence *that the student has violated or is violating* either the law or *the rules of the school.*" *Ante,* at 341–342. This standard will permit teachers and school administrators to search students when they suspect that the search will reveal evidence of even the most trivial school regulation or precatory guideline for student behavior. The Court's standard for deciding whether a search is justified "at its inception" treats all violations of the rules of the school as though they were fungible. For the Court, a search for curlers and sunglasses in order to enforce the school dress code[16] is apparently just as important as a search for evidence of heroin addiction or violent gang activity.

The majority, however, does not contend that school administrators have a compelling need to search students in

---

[16] Parent-Student Handbook of Piscataway [N. J.] H. S. (1979), Record Doc. S–1, p. 7. A brief survey of school rule books reveals that, under the majority's approach, teachers and school administrators may also search students to enforce school rules regulating:

(i) secret societies;

(ii) students driving to school;

(iii) parking and use of parking lots during school hours;

(iv) smoking on campus;

(v) the direction of traffic in the hallways;

(vi) student presence in the hallways during class hours without a pass;

(vii) profanity;

(viii) school attendance of interscholastic athletes on the day of a game, meet or match;

(ix) cafeteria use and cleanup;

(x) eating lunch off-campus; and

(xi) unauthorized absence.

See *id.,* at 7–18; Student Handbook of South Windsor [Conn.] H. S. (1984); Fairfax County [Va.] Public Schools, Student Responsibilities and Rights (1980); Student Handbook of Chantilly [Va.] H. S. (1984).

order to achieve optimum enforcement of minor school regulations.[17] To the contrary, when minor violations are involved, there is every indication that the informal school disciplinary process, with only minimum requirements of due process,[18] can function effectively without the power to search for enough evidence to prove a criminal case. In arguing that teachers and school administrators need the power to search students based on a lessened standard, the United States as *amicus curiae* relies heavily on empirical evidence of a contemporary crisis of violence and unlawful behavior that is seriously undermining the process of education in American schools.[19] A standard better attuned to this concern would permit teachers and school administrators to search a student when they have reason to believe that the search will uncover *evidence that the student is violating the law or engaging in conduct that is seriously disruptive of school order, or the educational process.*

This standard is properly directed at "[t]he sole justification for the [warrantless] search."[20] In addition, a standard

---

[17] Cf. *Camara* v. *Municipal Court*, 387 U. S. 523, 535–536 (1967) ("There is unanimous agreement among those most familiar with this field that the only effective way to seek universal compliance with the minimum standards required by municipal codes is through routine periodic inspections of all structures. . . . [I]f the probable cause standard . . . is adopted, . . . the reasonable goals of code enforcement will be dealt a crushing blow").

[18] See *Goss* v. *Lopez*, 419 U. S. 565, 583–584 (1975).

[19] "The sad truth is that many classrooms across the country are not temples of learning teaching the lessons of good will, civility, and wisdom that are central to the fabric of American life. To the contrary, many schools are in such a state of disorder that not only is the educational atmosphere polluted, but the very safety of students and teachers is imperiled." Brief for United States as *Amicus Curiae* 23.

See also Brief for National Education Association as *Amicus Curiae* 21 ("If a suspected violation of a rule threatens to disrupt the school or threatens to harm students, school officials should be free to search for evidence of it").

[20] *Terry* v. *Ohio*, 392 U. S. 1, 29 (1968); *United States* v. *Brignoni-Ponce*, 422 U. S., at 881–882.

that varies the extent of the permissible intrusion with the gravity of the suspected offense is also more consistent with common-law experience and this Court's precedent. Criminal law has traditionally recognized a distinction between essentially regulatory offenses and serious violations of the peace, and graduated the response of the criminal justice system depending on the character of the violation.[21] The application of a similar distinction in evaluating the reasonableness of warrantless searches and seizures "is not a novel idea." *Welsh* v. *Wisconsin,* 466 U. S. 740, 750 (1984).[22]

In *Welsh,* police officers arrived at the scene of a traffic accident and obtained information indicating that the driver of the automobile involved was guilty of a first offense of

---

[21] Throughout the criminal law this dichotomy has been expressed by classifying crimes as misdemeanors or felonies, *malum prohibitum* or *malum in se,* crimes that do not involve moral turpitude or those that do, and major or petty offenses. See generally W. LaFave, Handbook on Criminal Law § 6 (1972).

Some codes of student behavior also provide a system of graduated response by distinguishing between violent, unlawful, or seriously disruptive conduct, and conduct that will only warrant serious sanctions when the student engages in repetitive offenses. See, *e. g.,* Parent-Student Handbook of Piscataway [N. J.] H. S. (1979), Record Doc. S–1, pp. 15–16; Student Handbook of South Windsor [Conn.] H. S. ¶ E (1984); Rules of the Board of Education of the District of Columbia, Ch. IV, §§ 431.1–.10 (1982). Indeed, at Piscataway High School a violation of smoking regulations that is "[a] student's first offense will result in assignment of up to three (3) days of after school classes concerning hazards of smoking." Record Doc. S–1, *supra,* at 15.

[22] In *Goss* v. *Lopez,* 419 U. S., at 582–583 (emphasis added), the Court noted that similar considerations require some variance in the requirements of due process in the school disciplinary context:

"[A]s a general rule notice and hearing should precede removal of the student from school. We agree . . . , however, that there are recurring situations in which prior notice and hearing cannot be insisted upon. *Students whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school.* In such cases the necessary notice and rudimentary hearing should follow as soon as practicable . . . ."

driving while intoxicated—a civil violation with a maximum fine of $200. The driver had left the scene of the accident, and the officers followed the suspect to his home where they arrested him without a warrant. Absent exigent circumstances, the warrantless invasion of the home was a clear violation of *Payton* v. *New York*, 445 U. S. 573 (1980). In holding that the warrantless arrest for the "noncriminal, traffic offense" in *Welsh* was unconstitutional, the Court noted that "application of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense . . . has been committed." 466 U. S., at 753.

The logic of distinguishing between minor and serious offenses in evaluating the reasonableness of school searches is almost too clear for argument. In order to justify the serious intrusion on the persons and privacy of young people that New Jersey asks this Court to approve, the State must identify "some real immediate and serious consequences." *McDonald* v. *United States*, 335 U. S. 451, 460 (1948) (Jackson, J., concurring, joined by Frankfurter, J.).[23] While school administrators have entirely legitimate reasons for adopting school regulations and guidelines for student behavior, the authorization of searches to enforce them "displays a shocking lack of all sense of proportion." *Id.*, 459.[24]

---

[23] In *McDonald* police officers made a warrantless search of the office of an illegal "numbers" operation. Justice Jackson rejected the view that the search could be supported by exigent circumstances:

"Even if one were to conclude that urgent circumstances might justify a forced entry without a warrant, no such emergency was present in this case. . . . *Whether there is reasonable necessity for a search without waiting to obtain a warrant certainly depends somewhat upon the gravity of the offense thought to be in progress* as well as the hazards of the method of attempting to reach it. . . . [The defendant's] criminal operation, while a shabby swindle that the police are quite right in suppressing, was not one which endangered life or limb or the peace and good order of the community . . . ." 335 U. S., at 459–460.

[24] While a policeman who sees a person smoking in an elevator in violation of a city ordinance may conduct a full-blown search for evidence of the

The majority offers weak deference to these principles of balance and decency by announcing that school searches will only be reasonable in scope "when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student *and the nature of the infraction.*" *Ante,* at 342 (emphasis added). The majority offers no explanation why a two-part standard is necessary to evaluate the reasonableness of the ordinary school search. Significantly, in the balance of its opinion the Court pretermits any discussion of the nature of T. L. O.'s infraction of the "no smoking" rule.

The "rider" to the Court's standard for evaluating the reasonableness of the initial intrusion apparently is the Court's perception that its standard is overly generous and does not, by itself, achieve a fair balance between the administrator's right to search and the student's reasonable expectations of privacy. The Court's standard for evaluating the "scope" of reasonable school searches is obviously designed to prohibit physically intrusive searches of students by persons of the opposite sex for relatively minor offenses. The Court's effort to establish a standard that is, at once, clear enough to allow searches to be upheld in nearly every case, and flexible enough to prohibit obviously unreasonable intrusions of young adults' privacy only creates uncertainty in the extent of its resolve to prohibit the latter. Moreover, the majority's application of its standard in this case—to permit a male administrator to rummage through the purse of a female high school student in order to obtain evidence that she was smok-

---

smoking violation in the unlikely event of a custodial arrest, *United States* v. *Robinson,* 414 U. S. 218, 236 (1973); *Gustafson* v. *Florida,* 414 U. S. 260, 265–266 (1973), it is more doubtful whether a search of this kind would be reasonable if the officer only planned to issue a citation to the offender and depart, see *Robinson,* 414 U. S., at 236, n. 6. In any case, the majority offers no rationale supporting its conclusion that a student detained by school officials for questioning, on reasonable suspicion that she has violated a school rule, is entitled to no more protection under the Fourth Amendment than a criminal suspect under custodial arrest.

ing in a bathroom—raises grave doubts in my mind whether its effort will be effective.[25]   Unlike the Court, I believe the nature of the suspected infraction is a matter of first importance in deciding whether *any* invasion of privacy is permissible.

### III

The Court embraces the standard applied by the New Jersey Supreme Court as equivalent to its own, and then deprecates the state court's application of the standard as reflecting "a somewhat crabbed notion of reasonableness." *Ante*, at 343.   There is no mystery, however, in the state court's finding that the search in this case was unconstitutional; the decision below was not based on a manipulation of reasonable suspicion, but on the trivial character of the activity that promoted the official search.   The New Jersey Supreme Court wrote:

> "We are satisfied that when a school official has reasonable grounds to believe that a student possesses evidence of *illegal activity or activity that would interfere with school discipline and order*, the school official has the right to conduct a reasonable search for such evidence.
>
> "In determining whether the school official has reasonable grounds, courts should consider 'the child's age, history, and school record, *the prevalence and seriousness of the problem in the school to which the search was*

---

[25] One thing is clear under any standard—the shocking strip searches that are described in some cases have no place in the schoolhouse.   See *Doe* v. *Renfrow*, 631 F. 2d 91, 92–93 (CA7 1980) ("It does not require a constitutional scholar to conclude that a nude search of a 13-year-old child is an invasion of constitutional rights of some magnitude"), cert. denied, 451 U. S. 1022 (1981); *Bellnier* v. *Lund*, 438 F. Supp. 47 (NDNY 1977); *People* v. *D.*, 34 N. Y. 2d 483, 315 N. E. 2d 466 (1974); *M. J.* v. *State*, 399 So. 2d 996 (Fla. App. 1981).   To the extent that deeply intrusive searches are ever reasonable outside the custodial context, it surely must only be to prevent imminent, and serious harm.

*directed*, the exigency to make the search without delay, and the probative value and reliability of the information used as a justification for the search.'"[26]

The emphasized language in the state court's opinion focuses on the character of the rule infraction that is to be the object of the search.

In the view of the state court, there is a quite obvious and material difference between a search for evidence relating to violent or disruptive activity, and a search for evidence of a smoking rule violation. This distinction does not imply that a no-smoking rule is a matter of minor importance. Rather, like a rule that prohibits a student from being tardy, its occasional violation in a context that poses no threat of disrupting school order and discipline offers no reason to believe that an immediate search is necessary to avoid unlawful conduct, violence, or a serious impairment of the educational process.

A correct understanding of the New Jersey court's standard explains why that court concluded in T. L. O.'s case that "the assistant principal did not have reasonable grounds to believe that the student was concealing in her purse evidence of criminal activity or evidence of activity that *would seriously interfere with school discipline or order*."[27] The importance of the nature of the rule infraction to the New Jersey Supreme Court's holding is evident from its brief explanation of the principal basis for its decision:

> "A student has an expectation of privacy in the contents of her purse. Mere possession of cigarettes did not violate school rule or policy, since the school allowed smoking in designated areas. The contents of the handbag had no direct bearing on the infraction.
>
> "The assistant principal's desire, legal in itself, to gather evidence to impeach the student's credibility at a

---

[26] 94 N. J., at 346, 463 A. 2d, at 941–942 (quoting *State* v. *McKinnon*, 88 Wash. 2d 75, 81, 558 P. 2d 781, 784 (1977)) (emphasis added).

[27] 94 N. J., at 347, 463 A. 2d, at 942 (emphasis added).

hearing on the disciplinary infraction does not validate the search." [28]

Like the New Jersey Supreme Court, I would view this case differently if the Assistant Vice Principal had reason to believe T. L. O.'s purse contained evidence of criminal activity, or of an activity that would seriously disrupt school discipline. There was, however, absolutely no basis for any such assumption—not even a "hunch."

In this case, Mr. Choplick overreacted to what appeared to be nothing more than a minor infraction—a rule prohibiting smoking in the bathroom of the freshmen's and sophomores' building. [29] It is, of course, true that he actually found evidence of serious wrongdoing by T. L. O., but no one claims that the prior search may be justified by his unexpected discovery. As far as the smoking infraction is concerned, the search for cigarettes merely tended to corroborate a teacher's eyewitness account of T. L. O.'s violation of a minor regulation designed to channel student smoking behavior into designated locations. Because this conduct was neither unlawful nor significantly disruptive of school order or the educational process, the invasion of privacy associated with the forcible opening of T. L. O.'s purse was entirely unjustified at its inception.

A review of the sampling of school search cases relied on by the Court demonstrates how different this case is from those

---

[28] *Ibid.* The court added:

"Moreover, there were not reasonable grounds to believe that the purse contained cigarettes, if they were the object of the search. No one had furnished information to that effect to the school official. He had, at best, a good hunch. No doubt good hunches would unearth much more evidence of crime on the persons of students and citizens as a whole. But more is required to sustain a search." *Id.,* at 347, 463 A. 2d, at 942–943.

It is this portion of the New Jersey Supreme Court's reasoning—a portion that was not necessary to its holding—to which this Court makes its principal response. See *ante,* at 345–346.

[29] See Parent-Student Handbook of Piscataway [N. J.] H. S. 15, 18 (1979), Record Doc. S–1. See also Tr. of Mar. 31, 1980, Hearing 13–14.

in which there was indeed a valid justification for intruding on a student's privacy. In most of them the student was suspected of a criminal violation;[30] in the remainder either violence or substantial disruption of school order or the integrity of the academic process was at stake.[31] Few involved matters as trivial as the no-smoking rule violated by T. L. O.[32] The rule the Court adopts today is so open-ended that it may make the Fourth Amendment virtually meaningless in the school context. Although I agree that school administrators must have broad latitude to maintain order and discipline in our classrooms, that authority is not unlimited.

## IV

The schoolroom is the first opportunity most citizens have to experience the power of government. Through it passes every citizen and public official, from schoolteachers to

[30] See, e. g., Tarter v. Raybuck, 742 F. 2d 977 (CA6 1984) (search for marihuana); M. v. Board of Education Ball-Chatham Community Unit School Dist. No. 5, 429 F. Supp. 288 (SD Ill. 1977) (drugs and large amount of money); D. R. C. v. State, 646 P. 2d 252 (Alaska App. 1982) (stolen money); In re W., 29 Cal. App. 3d 777, 105 Cal. Rptr. 775 (1973) (marihuana); In re G., 11 Cal. App. 3d 1193, 90 Cal. Rptr. 361 (1970) (amphetamine pills); In re Donaldson, 269 Cal. App. 2d 509, 75 Cal. Rptr. 220 (1969) (methedrine pills); State v. Baccino, 282 A. 2d 869 (Del. Super. 1971) (drugs); State v. D. T. W., 425 So. 2d 1383 (Fla. App. 1983) (drugs); In re J. A., 85 Ill. App. 3d 567, 406 N. E. 2d 958 (1980) (marihuana); People v. Ward, 62 Mich. App. 46, 233 N. W. 2d 180 (1975) (drug pills); Mercer v. State, 450 S. W. 2d 715 (Tex. Civ. App. 1970) (marihuana); State v. McKinnon, 88 Wash. 2d 75, 558 P. 2d 781 (1977) ("speed").

[31] See, e. g., In re L. L., 90 Wis. 2d 585, 280 N. W. 2d 343 (App. 1979) (search for knife or razor blade); R. C. M. v. State, 660 S. W. 2d 552 (Tex. App. 1983) (student with bloodshot eyes wandering halls in violation of school rule requiring students to remain in examination room or at home during midterm examinations).

[32] See, e. g., State v. Young, 234 Ga. 488, 216 S. E. 2d 586 (three students searched when they made furtive gestures and displayed obvious consciousness of guilt), cert. denied, 423 U. S. 1039 (1975); Doe v. State, 88 N. M. 347, 540 P. 2d 827 (1975) (student searched for pipe when a teacher saw him using it to violate smoking regulations).

policemen and prison guards. The values they learn there, they take with them in life. One of our most cherished ideals is the one contained in the Fourth Amendment: that the government may not intrude on the personal privacy of its citizens without a warrant or compelling circumstance. The Court's decision today is a curious moral for the Nation's youth. Although the search of T. L. O.'s purse does not trouble today's majority, I submit that we are not dealing with "matters relatively trivial to the welfare of the Nation. There are village tyrants as well as village Hampdens, but none who acts under color of law is beyond reach of the Constitution." *West Virginia State Board of Education* v. *Barnette,* 319 U. S. 624, 638 (1943).

I respectfully dissent.