GOULD, Circuit Judge,
with whom KOZINSKI, Chief Judge, and GRABER, Circuit Judge, join, concurring in part in Judge PAEZ’s opinion and concurring in part in Judge M. SMITH’S opinion:
I join Parts I, II.A, II.B, II.C.2, and II.D of Judge Paez’s opinion, concerning the factual background, rejection of the challenges to jury instructions and to evi-dentiary rulings, and the conclusions that Chief McIntosh and Officer Prock used excessive force in violation of the Fourth Amendment when, in removing C.B. from school grounds, they handcuffed him for 25 to 30 minutes and that they are not entitled to qualified immunity for handcuffing C.B.
I join in Part I of Judge M. Smith’s opinion, concerning the unlawful seizure claim, concluding that the officers are entitled to qualified immunity as to the seizure of C.B.
On the issue of unlawful seizure: T.L.O.’s reasonableness standard requires that a search be “justified at its inception” and, “as actually conducted,” be “reasonably related in scope to the circumstances which justified the interference in the first place.” New Jersey v. T.L.O., 469 U.S. 325, 341, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (internal quotation marks omitted). We should give weight to the parts of the Court’s opinion in T.L.O. that gave its reasons for holding that “the school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject.” Id. at 340, 105 S.Ct. 733.
The Court’s primary concern in T.L.O. was balancing the “privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools.” Id. at 341, 105 S.Ct. 733. The need for order in the school setting permits searches when reasonable grounds exist to suspect violations not just of law, but of “the rules of the school.” Id. at 342, 105 S.Ct. 733. When a court examines the rules of a school, it “should, as a general matter, defer” to the school’s judgment that the rule is necessary to prevent “conduct [that] is destructive of school order or of a proper edu *1039 cational environment.” Id. at 343 n. 9, 105 S.Ct. 733. In applying this standard to the facts of T.L.O.’s case, the Court approved of a school administrator’s use of “the sort of common-sense conclusio[ns] about human behavior upon which practical people — including government officials — are entitled to rely.” Id. at 346, 105 S.Ct. 733 (internal quotation marks omitted).
In concurrence, Justices Powell and O’Connor stressed the “special characteristics” of the school environment, noting that “teachers have a degree of familiarity with, and authority over, their students that is unparalleled except perhaps in the relationship between parent and child.” Id. at 348, 105 S.Ct. 733. Based on this relationship, the concurring Justices concluded that “[t]he primary duty of school officials and teachers ... is the education and training of young people. A State has a compelling interest in assuring that the schools meet this responsibility. Without first establishing discipline and maintaining order, teachers cannot begin to educate their students.” Id. at 350, 105 S.Ct. 733 (Powell and O’Connor, JJ., concurring).
Reasonable officers could have believed that the Constitution allows them to remove a student from school grounds based on a facially reasonable request from school officials. This conclusion is reinforced by the facts. Coach Sinclair, the requesting official, was the school’s official disciplinarian, the person most responsible for maintaining order at Sonora Elementary. Coach Sinclair’s request was supported by contentions that C.B. was a runner and had not taken his medicine. The allegations supported the notion that C.B. was violating the rules of the school or impairing discipline and maintenance of order, prerequisites to educating students. See id. Finally, the police officers were on campus for less than five minutes before taking C.B. into custody. This brief visit to the school environment could not safely give them such information as would be necessary to overrule the considered judgment of a school official, particularly given the close relationship between teachers and students. See id. at 348, 105 S.Ct. 733.
In the modern world, delay in the school setting can pose grave dangers to many, an unfortunate fact that may at times require police to act promptly upon arrival. In the context of dangers presented to students at schools, rather than require officers to make an independent investigation when they arrive at a school, a reasonable police officer could believe that the Constitution would allow him or her to rely on responsible school officials. Here, the officers could reasonably have believed that relying on Coach Sinclair over what they personally saw in their brief and isolated visit was the kind of “common-sense conclusion” that T.L.O. was intended to permit. Id. at 346, 105 S.Ct. 733 (majority opinion). When a school official makes a determination that it is necessary to remove a student from campus to maintain order, protect that student or others, or otherwise to prevent the destruction of the “proper educational environment,” id. at 343 n. 9, 105 S.Ct. 733, in my view a reasonable officer could have believed that he or she was entitled to rely on that judgment.
On the issue of excessive force by handcuffing: Police officers may reasonably believe that the Fourth Amendment permits them to give deference to a school official’s request that a student be removed from campus. But that reasonable belief in deference does not extend to the level of force that they may use to accomplish the removal. See, e.g., Acosta v. City of Costa Mesa, 718 F.3d 800, 826 (9th Cir.2013) (per curiam) (analyzing separately a claim of *1040 unreasonable seizure or arrest and “whether the officers employed excessive force when enacting the seizure and arrest”). The officers violated the Fourth Amendment by handcuffing C.B., and they are not protected from C.B.’s excessive force claim by qualified immunity. None of the reasons motivating the Supreme Court’s decision in T.L.O. bears on police officers’ use of force. Neither the need for compliance with school rules, nor the close relationship between teachers and students, nor the importance of maintaining the educational environment has any connection with the amount of force permissibly used by officers in carrying out an otherwise reasonable request from school officials.
The Supreme Court was explicit in Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), that the application of Fourth Amendment reasonableness to excessive force claims “requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat -to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.” C.B. was not charged with or suspected of any crime. There is no evidence that C..B. posed an immediate safety risk to himself, to the officers, or to anyone else on the scene. And there was no testimony that C.B. tried to escape, nor did the officers believe that there was any reasonable possibility that he could or would attempt to do so. Finally, the officers’ unreasonable decision to use handcuffs was compounded by their decision to leave the handcuffs on during a 30-minute trip in which C.B. was secured in the back of a police cruiser with no possibility of escape or harm to himself or others.
The Supreme Court’s jurisprudence has firmly established that the force police officers apply must be reasonable. Under the totality of the circumstances, it was not reasonable to handcuff a small and docile 11-year-old child. The Supreme Court’s law requiring that a reasonable level of force be used against the citizenry is crystal clear and well established.