Opinion issued August 23, 2016



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-15-00508-CR
_____

**JUAN ALEJANDRO VALDERAMA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 178th District Court
Harris County, Texas
Trial Court Case No. 1423465

## MEMORANDUM OPINION

After the trial court denied his motion to suppress evidence, appellant, Juan Alejandro Valderama, with an agreed punishment recommendation from the State, pleaded guilty to the offense of possession of a controlled substance, namely

cocaine, weighing less than one gram, in a drug-free zone.[1] In accordance with the plea agreement, the trial court deferred adjudication of his guilt, placed him on community supervision for four years, and assessed a fine of $200. In his sole issue, appellant contends that the trial court erred in denying his motion to suppress evidence.

We affirm.

## Background

At a hearing on appellant's motion to suppress, Pasadena Independent School District ("PISD") Police Department Officer M. Rodriguez testified that on April 2, 2014, he was assigned to monitor Pasadena Memorial High School (the "high school"). He saw appellant and another student, Jonathan Castillo, standing at the trunk of a "blue sports car" that was parked in the "horseshoe-drive through" in front of the school. Rodriguez recognized the car "right away" as belonging to Lacy Summerall, a former student, because he had "dealt with her as far as speeding [through] a parking lot." And he saw Summerall standing at the open trunk of the car, "handing [appellant] some books." As Rodriguez approached them, Summerall closed the car's trunk, got into the car, and drove away.

Officer Rodriguez explained that appellant and Castillo were supposed to be in class at the time. And when he asked them why they were not in class, Castillo

---

[1]     See TEX. HEALTH & SAFETY CODE ANN. §§ 481.103(3)(D), 481.115(b) (Vernon 2010), § 481.134 (Vernon Supp. 2015).

2

became "very defensive" and "argumentative." Rodriguez became suspicious because "[m]ost kids" would have said, "I was just getting my books." However, Castillo "became so defensive over a simple question" that Rodriguez thought "[m]aybe he was hiding something." Rodriguez also noted that he had seen photographs of Summerall on "social media, advertising drug usage with several other students at [the high school,] as well as herself using drugs." And "she wasn't shy [about] advertis[ing] what she was doing at all." Rodriguez opined that there "may have been a drug transaction occurring" between appellant and Summerall. He further opined that "all three of them" were "connected in a drug transaction."

Officer Rodriguez escorted appellant and Castillo to speak with Assistant Principal John Thompson. And Rodriguez placed them in a "little waiting area" in front of Thompson's office, which was under a secretary's supervision. Rodriguez then went into Thompson's office and told him that he had seen appellant and Castillo "outside with" Summerall when "they were supposed to be in class." Thompson decided to perform an "administrative search" of Castillo, and he found in a back pocket of Castillo's pants "an unusual amount of marijuana," which Rodriguez confirmed through field testing. Thompson then took appellant to another office to search him. A short time later, Thompson returned to Rodriguez with a "black wallet" that contained a "small" "clear-plastic baggy with a white

3

powder substance inside of it." And a field test revealed that the substance was cocaine.

Thompson testified that on April 2, 2014, Officer Rodriguez informed him that he had seen appellant and Castillo, who both should have been in class, outside the school building with Summerall at her car. And Rodriguez specifically told him that he had seen appellant and Castillo "taking something" or "exchanging something out of [Summerall's] car," "out of her trunk." This information, based on his prior experiences with Castillo and Summerall and "their relationship with narcotics," raised Thompson's suspicions. He noted that in her senior year, he had disciplined Summerall for "being under the influence of marijuana" at school. And she had been "outspokenly pro marijuana use." Thompson further noted that Castillo, who "had a reputation" for "being involved with drugs at the school," had previously "come to [him] and offer[ed] information on students [who] had . . . narcotics on their person." And, "most times," his information was reliable.

Thompson explained that because appellant, at the time Officer Rodriguez saw him outside in front of the school, "should have been in his class," he was truant pursuant to PISD policy.[2] The high school is a "closed campus," meaning that students are not allowed to leave the assigned area during lunch without a pass

---

[2] Thompson explained that PISD defines "truancy" as a student not being in his assigned place at the pertinent time.

4

or permission from an assistant principal.  And it is a violation of school rules for students to be outside in front of the school during the school day, unless they have checked out through the school office.

After Officer Rodriguez had escorted appellant and Castillo to Thompson's office, Castillo told Thompson that Summerall had simply handed appellant a binder.  Thompson believed that a search of appellant and Castillo was "necessary" because they had been outside of the school "talking to someone" who "should not have been there at that time"; there had been "an exchange of a binder at that time from someone" with whom Thompson had had prior experiences involving narcotics; and "their behavior at the time was evasive" and "very non-direct."

From PISD's "Student Code of Conduct," Thompson read into the record that "school officials may search a student or student's property if school officials have reasonable suspicion to believe that either the law or school rules are being violated by the student."  And "[s]earches of a student's outer clothing, pockets and articles of personal property, such as purses, wallets and bags may be conducted if reasonable suspicion exists to believe that either the law or school rules are being violated by the student."  Thompson noted that all students are required to sign a form stating that they have received copies of these policies.  And the trial court admitted into evidence the Student Code of Conduct and Student Handbook.

Thompson further testified that when he searched Castillo's outer clothing and shoes, he found "loose" in the right back pocket of Castillo's pants "trace amounts of marijuana." "After it tested positive," Thompson "decided that . . . maybe [appellant] might also have some narcotics," and he "decided to pull him into another office and search him."

Appellant then told Thompson that he had been "out front trying to get his binder from [Summerall] because he had been over there the [previous] night." Thompson noted that although appellant's tone was "respectful," he "display[ed] very apprehensive characteristics." Rather than looking "directly" at Thompson, appellant "look[ed] to the ground." And he shook "slightly" and seemed "very nervous." In Thompson's "experience," such behavior "indicates someone who's not being truthful," and he performed a search of appellant's "person." After he did not find any contraband, Thompson left the office and spoke to a secretary. She told Thompson that appellant had left his binder under the chair in which he had been seated in the waiting area. She further noted that appellant had been "playing with it and acting nervous." Thompson picked up the binder, went back into the office with appellant, confirmed that the binder belonged to him, and told him that he was going to search it. Inside the binder, Thompson found a wallet containing a clear plastic "bag of cocaine."

6

Appellant testified that on April 2, 2014, while he was a twelfth-grade student, he, during his lunch period, met with Summerall and Castillo in front of the high school, where Summerall handed him a binder. During cross-examination, appellant admitted that he had violated school rules by being outside the school during his lunch period because he was "not where [he] was supposed to be." He also admitted that, when Officer Rodriguez took him into the principal's office, he sat in front of a secretary's desk and waited. And, while he waited, he had placed his wallet inside the binder and placed the binder on the floor next to his chair.

The trial court denied appellant's motion to suppress, specifically finding, in part, as follows:

> [3.] Officer Rodriguez, while monitoring school lunch on April 2, 201[4], went to the front of the building, and . . . noticed a blue sports car parked in the vicinity directly in front of the building which was a driveway parking lot for administration, teachers and visitors and not students. He observed [appellant] and a fellow classmate [Castillo], who Rodriguez knew to have been involved with marijuana on campus.

> [4.] Officer Rodriguez saw [Summerall], another student he knew by viewing social media depicting her to have been an advocate of marijuana use and bragging on said media about getting high with other current students at the school. Officer Rodriguez noticed her talking to [appellant] and Castillo and saw her handing books to [appellant] while she was standing by the trunk of her vehicle. He observed Summerall drive off.

> . . . .

> [6.] [Officer Rodriguez] asked [appellant and] Castillo why they were in front of the drive-through and [appellant] replied that he was getting books from [Summerall] and Castillo became defensive . . . .

7

. . . .

[10.] [W]hen Officer Rodriguez saw [Summerall] handing [appellant] those books, he thought it may have been a drug transaction between two students because of pictures on social media of Summerall using drugs [with] several other students at Pasadena Memorial High School.

. . . .

[13.] Officer Rodriguez also thought [appellant] could be hiding something from him and also seeing that he was with Castillo and [Summerall] out in front of the school and that [Summerall] handed [appellant] books.

[14.] Officer Rodriguez thought that based on this observation all three were connected and in a drug transaction.

. . . .

[57.] [Thompson] also disciplined [Summerall] the previous year for being under the influence of marijuana.

. . . .

[62.] Officer Rodriguez had escorted [appellant and] Castillo from the front of the building and relayed the information to AP Thompson concerning the conversation he had . . . and contact he observed between [appellant,] Castillo and Summerall, and the exchange of something out of Summerall's trunk.

. . . .

[67.] AP Thompson searched [Castillo] first with Officer Rodriguez present, and based on the information he received from Officer Rodriguez concerning conversations and the actions in front of the school, he searched Castillo because he knew Castillo's relationship with drugs and also . . . Summerall's relationship with drugs, and he believed that Castillo had drugs on him at the time.

. . . .

[69.] . . . AP Thompson thought that since Castillo had marijuana, he decided that [appellant] might also have some narcotics on him. So he decided to pull [appellant] into another office and search him, as well.

8

[70.] AP Thompson in the presence of [appellant] and Dr. Angela Kennedy and other [sic] assistant principal and one of her secretaries were in the room while he conducted the search of [appellant].

. . . .

[72.] AP Thompson indicated at the time he searched [appellant], searched his person, the binder was not in the office . . . . And due to the fact that [appellant] had been outside with Castillo and Summerall and Castillo had marijuana on his person and Summerall had given [appellant] a binder, . . . AP Thompson searched his person and thought that maybe there would be narcotics on [appellant].

[73.] AP Thompson found nothing on his person and he left him in the office and walked outside the office, and the secretary told him that [appellant's] binder was sitting under the chair where [appellant] had been sitting earlier, and that earlier he was playing with it and acting nervous.

. . . .

[75.] AP Thompson asked if it was [appellant's] binder and [appellant] indicated that it was. AP Thompson found a wallet in the binder, opened the wallet and found a small bag of cocaine. [He] [t]ook it to the police office where . . . Officer Rodriguez . . . field tested it, [and it] tested positive . . . .

The trial court made the following conclusions of law:

[1.] Officer Rodriguez's detention of [appellant and] Castillo, a known marijuana user and informant, outside the school building on the sidewalk in the driveway area, front driveway area was not under arrest, but an investigatory detention. And he had reasonable suspicion that [appellant] and/or Castillo were in violation of school code of conduct rules by being outside the building during lunch period, or during the classroom period without permission.

[2.] Officer Rodriguez's stop and detention of [appellant] was based upon articulable facts, to wit, that [appellant] and Castillo were in a prohibited area outside the school building, in front of the driveway near the front parking lot area and took a book or books from another student who drove off, who also had a known reputation for marijuana use. These facts gave rise to the reasonable suspicion

9

that [appellant] and [Summerall] may have been involved in a drug transaction, therefore, the temporary detention and escorting [appellant] to AP Thompson's office was lawful, and the resulting search was justified at its inception.

[3.] AP Thompson who was responsible for twelfth grade, all safety issues, all security issues and monitored all discipline issues for the twelfth grade, including [appellant], when briefed by Officer Rodriguez as to all the details of what Officer Rodriguez had observed and knew about Castillo and Summerall, coupled with AP Thompson's own knowledge of Castillo as an informant and user and of Summerall as a user of marijuana, had reasonable suspicion to believe that both [appellant] and Castillo had at minimum violated [the] Student Code of Conduct by not being where they were supposed to be at that particular time and therefore by being out of the building without a pass or permission from an adult, [appellant] was in violation of school rules.

[4.] AP Thompson had reasonable suspicion also to believe Castillo had committed a law violation, possession of controlled substance based upon the information he had from Officer Rodriguez and his own knowledge of Castillo and the search of Castillo having been legally justified in accordance with page 29 of the Student Code of Conduct . . . did have reasonable suspicion to search Castillo.

[5.] AP Thompson having searched Castillo and found a small amount of marijuana in his back pocket, had articulable facts that . . . [appellant,] who had been outside the building without permission with Castillo and Summerall, instead of in his fourth period class, and who had received a binder from [Summerall] outside the building had reasonable suspicion to believe that [appellant] might also be in possession of illegal drugs.

[6.] AP Thompson's search of [appellant's] person was lawful and reasonable under all circumstances of the search.

[7.] AP Thompson's subsequent search of [appellant's] binder, which a secretary informed him was placed by the [appellant] next to the chair before he was searched by AP Thompson in the presence of others was based upon the information AP Thompson already had at the time of the search of [appellant's] person and all these articulable facts is reasonable suspicion that [appellant] might have illegal drugs in the binder and/or his person.

[8.] AP Thompson's search of [appellant's] binder and wallet, and his search and seizure of those items recovered the cocaine was based upon reasonable suspicion the binder and/or his person might contain illegal drugs.

[9.] . . . And [Thompson's] . . . search of [appellant] . . . was justified at its inception as AP Thompson had credible information that [appellant] had committed a violation of school law and had reasonable suspicion to believe he violated state law, possession of some narcotics.

[10.] AP Thompson's knowledge of what Rodriguez told him, plus Thompson's knowledge that [appellant] spoke to an outside person and was handed books or a binder, as [appellant and] Castillo admitted, and Rodriguez's suspicion that a drug transaction had gone down between [appellant] and [Summerall] and AP Thompson's result of search of Castillo and [appellant] were both reasonably related in scope to the search and justified his interference with [appellant] in the first place.

[11.] [T]he search of [appellant] was justified at its inception because reasonable grounds existed for both Officer Rodriguez and AP Thompson to believe that [appellant] violated school rules as to truancy, as well as having reasonable grounds for suspecting [appellant] has or is at the time in violation of the law of possessing illegal drugs and the search was reasonably tailored to the circumstances of the interference.

Accordingly, the search was reasonable and not a violation of the Fourth Amendment to the U.S. Constitution,[3] Article 1, Section 9 of the Texas Constitution[4] and statutes of the State of Texas.

## Standard of Review

We review a trial court's denial of a motion to suppress evidence under a bifurcated standard. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). "We review the trial court's factual findings for an abuse of discretion, but

---

3      U.S. CONST. amend. IV.

4      TEX. CONST. art. I, § 9.

11

review the trial court's application of law to the facts de novo." *Id*. We give almost total deference to a trial court's determination of historical facts, especially if those determinations turn on witness credibility or demeanor, and we review de novo the trial court's application of the law to facts not based on an evaluation of credibility and demeanor. *Gonzales v. State*, 369 S.W.3d 851, 854 (Tex. Crim. App. 2012); *Neal v. State*, 256 S.W.3d 264, 281 (Tex. Crim. App. 2008). At a suppression hearing, the trial court is the sole and exclusive trier of fact and judge of the witnesses' credibility and may choose to believe or disbelieve all or any part of the witnesses' testimony. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). When, as here, the trial court makes findings of fact, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those findings. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). We review the trial court's legal ruling de novo unless its explicit findings that are supported by the record are also dispositive of the legal ruling. *Id*. We will sustain the trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Ross*, 32 S.W.3d at 855–56.

## Motion to Suppress Evidence

In his sole issue, appellant argues that the trial court erred in denying his motion to suppress the cocaine seized from his binder and wallet because the

12

search was not "reasonably related to his truancy." *See* U.S. CONST. amend. IV; TEX. CONST. art. I, § 9; TEX. CODE CRIM. PROC. ANN. art. 38.23 (Vernon 2005); *see also New Jersey v. T.L.O.*, 469 U.S. 325, 337, 105 S. Ct. 733, 740 (1985).

The Fourth Amendment applies to searches of students by school authorities. *T.L.O.*, 469 U.S. at 337, 105 S. Ct. at 740. However, the school setting requires "some modification of the level of suspicion of illicit activity needed to justify a search." *Id.* at 340, 105 S. Ct. at 742. Accommodating both the privacy interests of children and the substantial need of teachers and administrators to maintain order "does not require strict adherence to the requirement that searches be based on probable cause to believe the subject of the search has violated or is violating the law." *Id.* Rather, the legality of the search of a student "depend[s] simply on the reasonableness, under all the circumstances." *Id.* "By focusing attention on the question of reasonableness, the standard . . . spare[s] teachers and school administrators the necessity of schooling themselves in the niceties of probable cause and permit[s] them to regulate [student] conduct according to the dictates of reason and common sense." *Id.* at 343, 105 S. Ct. at 743.

In determining the reasonableness of a search of a student by school authorities, a court conducts a two-prong inquiry. *Id.* at 469 U.S. at 341, 105 S. Ct. at 742–43; *see Coronado v. State*, 835 S.W.2d 636, 640 (Tex. Crim. App. 1992). First, the search must be "justified at its inception." *T.L.O*, 469 U.S. at 341, 105 S.

13

Ct. at 742–43. A search is justified at its inception if reasonable grounds exist to suspect that the search will reveal evidence that a student has violated, or is violating, the law or school rules. *Id.* at 341–42, 105 S. Ct. at 743. Second, the search, "as actually conducted," must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 341, 105 S. Ct. at 743. This requirement is met if the measures used are "reasonably related to the objectives of the search and are not excessively intrusive in light of the nature of the infraction and the age and sex of the student." *Id.* at 342, 105 S. Ct. at 743.

Here, appellant, in his brief, concedes that the search was justified at its inception. *See id.* at 341, 105 S. Ct. at 742–43. He states that, "[a]dmittedly," he was "seen outside of the school building during school hours speaking with [Summerall] at her car." And, "[a]t that point," Officer Rodriguez, who was "legitimately investigating a violation of the school rule against truancy," "lawfully detained" him. He argues, however, that because "there is no evidence suggesting a connection" between "his truancy" and the search of his binder and wallet, the search was unreasonable under "the second prong of [*T.L.O.*]." *See id.* at 341, 105 S. Ct. at 743.

In support of his argument, appellant relies on *Coronado v. State*, 835 S.W.2d 636 (Tex. Crim. App. 1992). In *Coronado*, Benning, a high-school assistant principal, received a tip from an informant that the defendant, a student,

14

had attempted to sell narcotics to another student. *Id.* at 637. Benning searched the defendant, but found no contraband. *Id.* Several days later, a school secretary informed Benning that the defendant was attempting to leave campus, purportedly to attend his grandfather's funeral. *Id.* After verifying that the defendant's story was false, Benning located the defendant and asked where he had parked his car. *Id.* After the defendant replied that he had not driven to school that day, Benning confirmed with another student that the defendant had in fact driven his car to school. *Id.* And Benning sent a security officer to the student parking lot to locate the defendant's car. *Id.*

Benning then detained the defendant and called Randall, a sheriff's deputy assigned to the school, to his office. *Id.* at 638. After Benning "patted down" the defendant "for safety," he asked him to remove his shoes and socks and to "pull down his pants." *Id.* After a search lasting "approximately forty-five minutes," Benning, having found no contraband, searched the defendant's locker. *Id.* Again finding nothing, Benning, Randall, and a school security guard then accompanied the defendant to his car, where Benning demanded that he open the car. *Id.* When the defendant opened the trunk, Benning saw him attempt to hide a paper bag. *Id.* at 639. Subsequently, Randall discovered in the trunk bags of white powder, scales, and marijuana. *Id.* After Randall arrested the defendant and handcuffed

him to a chair in an office for "two to three hours," he gave a statement in which he revealed past and pending "drug deals." *Id.*

The court concluded that Benning had "reasonable grounds to suspect that [the defendant] was violating school rules by 'skipping.'" *Id.* at 641. However, the subsequent searches of the defendant's clothing, person, locker, and car "were not reasonably related in scope to the circumstances which initially justified Benning's interference with [the defendant], i.e., Benning's suspicion of [the defendant's] skipping school." *Id.* Rather, the searches were "excessively intrusive in light of the infraction of attempting to skip school." *Id.* And, "nothing observed during the patdown or subsequent search of [the defendant's] clothes and person, or locker . . . justif[ied] Benning's expansion of the search to [the defendant's] vehicle." *Id.*

Here, unlike in *Coronado*, the record reveals suspicious behavior beyond that of appellant's truancy. Although Officer Rodriguez initially stopped appellant to question him about being outside the school when he was supposed to be in class, this alone did not constitute the basis for Thompson's search of appellant. At the time of his search, Thompson was aware that Rodriguez had seen appellant and another student, Castillo, outside the school in a driveway, standing with Summerall at the open trunk of her car. Thompson and Rodriguez each knew Summerall as a former student with a history of narcotics use and promotion. And

16

Rodriguez had seen appellant "taking something" or "exchanging something out of [Summerall's] car," specifically, "out of her trunk." When Rodriguez approached, Summerall closed the trunk, got into the car, and drove away. Castillo behaved "very defensive[ly]," and he was "argumentative" toward Rodriguez. And Thompson subsequently found marijuana in the back pocket of Castillo's pants. Moreover, appellant was evasive when Thompson asked him about his exchange with Summerall. At that point, Thompson suspected that appellant had been involved in a narcotics transaction and was carrying contraband. *See T.L.*O, 469 U.S. at 341, 105 S. Ct. at 742–43.

Thompson's search progressed to appellant's binder because appellant told him that he had obtained the binder from Summerall, and Thompson's secretary told him that appellant, while seated in the waiting area, had acted "nervous," "play[ed] with" the binder, and placed it under his chair when he went in to speak with Thompson. *See id.* at 342, 105 S. Ct. at 743.

In a similar case, a school police officer saw the defendant and another student returning to school from "an off-campus excursion." *Landry v. State*, No. 14-03-01254-CR, 2005 WL 725031, at *1 (Tex. App.—Houston [14th Dist.] Mar. 31, 2005, no pet.) (mem. op., not designated for publication). The officer suspected that the defendant and the other student had violated school rules by leaving campus without permission, and the officer communicated this information

17

to a second officer, Cook, who approached the defendant and performed a pat-down search.  *Id.*  Cook then escorted the defendant to meet with an assistant principal.  *Id.*  While in the assistant principal's office, Cook saw the defendant open her purse and "fumble" through it.  *Id.*  Because Cook feared that the defendant might have a weapon, she took the purse from the defendant and placed it on the principal's desk.  *Id.*  The assistant principal subsequently searched the purse "for weapons and contraband" and discovered marijuana.  *Id.*

On appeal in *Landry*, the defendant argued that because there was no evidence that she had been engaged in criminal activity, Cook did not possess the requisite reasonable suspicion to justify the pat-down search or seizure of her purse.  *Id.* at *2.  Further, because the assistant principal did not possess information that the defendant had been engaged in illegal activity while off campus, his subsequent search of her purse was not justified.  *Id.*  Cook had testified that, in her experience, students taking unauthorized trips off campus often "are either smoking or they are doing something they shouldn't be doing," and they could return to campus with contraband.  *Id.*  Likewise, the assistant principal testified that students returning from unauthorized trips off campus could return with contraband.  *Id.*  And, at the time the assistant principal searched the defendant's purse, he was aware that the defendant and another student had been seen returning to campus and that Cook had seen the defendant rummaging

18

through her purse. *Id.* at *3. The court concluded that the search of the defendant's purse was justified at its inception and reasonably related in scope to determining whether the defendant possessed contraband. *Id.*

In another similar case, the defendant stood accused of the offense of possession of cocaine in an amount less than one gram in a drug-free zone, and he challenged the legality of the search. *Briseno v. State*, No. 05-02-01630-CR, 2003 WL 22020800, at *1 (Tex. App.—Dallas Aug. 28, 2003, no pet.) (not designated for publication). An assistant principal approached the defendant in the hallway of a school to find out why he was not in class. *Id.* The assistant principal noted that the defendant was evasive and, upon arriving at his classroom, quickly dropped his backpack under a table near another student. *Id.* The defendant's evasiveness and attempt to separate himself from the backpack led the assistant principal to suspect that he was hiding contraband in the backpack. *Id.* The assistant principal then told the defendant to "come into the library office and bring his backpack." *Id.* After the assistant principal found "a ziplock plastic bag of what appeared to be marijuana inside the backpack," he called the "school's police officer liaison," who subsequently found cocaine on the defendant's person. *Id.*

On appeal in *Briseno*, the defendant contended that his tardiness to class coupled with the assistant principal's subjective feeling that his behavior was suspicious did not justify the search of his backpack. *Id.* at *2. The court held that

19

the assistant principal was justified in approaching the defendant because he was "truant," or at least late to class, and, therefore, in violation of school policy and state law. *Id.* And, because the defendant was evasive and had dropped his backpack under a table near another student, rather than carrying it to his own seat, the court concluded that the assistant principal had a reasonable suspicion that the defendant had contraband in his backpack. *Id.* And the court held that the search of the defendant's backpack was justified at its inception and reasonably related in scope to the assistant principal's suspicion that the backpack contained contraband. *Id.* at *3.

Here, as in *Landry* and *Briseno*, appellant was seen by a school official, i.e., a campus police officer, outside of school or class, during the school day, without authorization. *See Landry*, 2005 WL 725031, at *1; *Briseno*, 2003 WL 22020800, at *1. And the officer initially stopped appellant for truancy. *See Landry*, 2005 WL 725031, at *1; *Briseno*, 2003 WL 22020800, at *1. After the officer escorted appellant to the principal's office, he became evasive, "act[ed] nervous," and "play[ed] with" the binder that he had obtained from Summerall while he was outside of the school. *See Landry*, 2005 WL 725031, at *1; *Briseno*, 2003 WL 22020800, at *2. Moreover, he attempted to separate himself from the binder. *See Briseno*, 2003 WL 22020800, at *1. And Thompson, based on his experience as a school administrator, testified that students will typically hide narcotics in pockets,

20

binders, socks, and shoes. *See Landry*, 2005 WL 725031, at *2. Thus, the initial stop, questioning, and searches of appellant followed a logical progression that led to the discovery of cocaine in his wallet. *See Coronado*, 835 S.W.2d at 641.

Appellant asserts that nervousness and criminal history "alone" are insufficient to establish reasonable suspicion. However, although nervousness alone is not sufficient to establish reasonable suspicion, it is a factor to be considered. *Hamal v. State*, 390 S.W.3d 302, 308 (Tex. Crim. App. 2012). "Likewise, a prior criminal record does not by itself establish reasonable suspicion but is a factor that may be considered." *Id.*

Appellant further asserts that Thompson's testimony reflects that he was merely "speculating" that he "might" find narcotics on appellant when he decided to search him. In *T.L.O.*, a teacher discovered two students, in violation of school rules, smoking in a school restroom. 469 U.S. at 328, 105 S. Ct. at 735. The teacher escorted the students to the principal's office, where one of the students admitted that she had been smoking. *Id.* After T.L.O. denied that she had been smoking, the principal demanded to look inside her purse. 469 U.S. at 328, 105 S. Ct. at 735–36. In the purse, the principal found a pack of cigarettes and "rolling papers." *Id.* The discovery of the "rolling papers" prompted a more thorough search of the purse, which revealed marijuana, a pipe, empty plastic bags, money, a list of students, and information that implicated T.L.O. in marijuana dealing. *Id.*

The New Jersey Supreme Court concluded that the evidence was inadmissible because possession of cigarettes was not in itself a violation of law or school rules and, thus, the contents of T.L.O.'s purse could have "no direct bearing on the infraction" of which she was accused (smoking in a restroom where smoking was prohibited). *Id.* at 344, 105 S. Ct. at 744. The court further noted that the teacher had no reasonable grounds to suspect that T.L.O. had cigarettes in her purse, and there was no reason to search her purse. *Id.* At best, the teacher had "a good hunch." *Id.* at 345, 105 S. Ct. at 744.

In reviewing the New Jersey Supreme Court's opinion, the United States Supreme Court concluded that the principal's search of the student's purse was justified at its inception because a teacher had reported that T.L.O. had been smoking in a restroom. *Id.* at 345–46, 105 S. Ct. at 745. The Supreme Court explained that the principal had reason to suspect that T.L.O. was carrying cigarettes, and, if T.L.O. did have cigarettes, her purse was the obvious place in which to find them. *Id.* The principal's suspicion that T.L.O. had cigarettes in her purse was not an "inchoate and unparticularized suspicion or 'hunch.'" *Id.* at 346, 105 S. Ct. at 745. Rather, it was the "sort of 'common-sense conclusio[n] about human behavior' upon which 'practical people'—including government officials—are entitled to rely." *Id.*

Likewise, as discussed above, Thompson's suspicion that appellant had contraband on his person or in the binder he had just obtained from Summerall was not just a "hunch." *See id.* at 343, 105 S. Ct. at 743 (focusing legality of search of student "on the reasonableness, under all the circumstances" allows school administrators "to regulate [student] conduct according to the dictates of reason and common sense"). The trial court could have reasonably concluded that Thompson's search of appellant was justified at its inception because reasonable grounds existed to suspect that the search would reveal evidence that appellant was violating the law by possessing narcotics. *See id.* at 341, 105 S. Ct. at 742–43. And it could have further reasonably concluded that Thompson's search was reasonably related in scope to that objective and was not excessively intrusive. *See id.* at 342, 105 S. Ct. at 743. Accordingly, we hold that the trial court did not err in denying appellant's motion to suppress evidence.

We overrule appellant's sole issue.

## Conclusion

We affirm the judgment of the trial court.


Terry Jennings
Justice

Panel consists of Justices Jennings, Massengale, and Huddle.

Do not publish. TEX. R. APP. P. 47.2(b).

23